**FOX ROTHSCHILD LLP**
Jeffrey M. Pollock
James M. Lemonedes
Nancy E. Halpern
100 Park Avenue
Suite 1500
New York, NY 10017
Telephone: (212) 878-7900
Facsimile:  (212) 692-0940
JMPollock@FoxRothschild.com
JLemonedes@foxrothschild.com
NHalpern@foxrothschild.com

*Attorneys for Plaintiff*
*New York Pet Welfare Association, Inc.*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NEW YORK PET WELFARE ASSOCIATION, INC., <br><br> Plaintiff, <br><br> v. <br><br> THE CITY OF NEW YORK, THE NEW YORK CITY COUNCIL, COREY JOHNSON, individually and in his capacity as New York City councilman, and ELIZABETH S. CROWLEY, individually and in her capacity as New York City councilwoman, <br><br> Defendants. | Civil Action No.: 1:15-cv-03159 (JG) (CLP) <br><br> **[PROPOSED]** <br> **VERIFIED SECOND AMENDED COMPLAINT** |

Plaintiff, New York Pet Welfare Association, Inc. ("NYPWA" or "Plaintiff"), by way of its First Amended Complaint against Defendants, the City of New York (the "City"), the New York City Council (the "Council"), Councilman Corey Johnson ("Johnson"), and Councilwoman Elizabeth S. Crowley ("Crowley"),(collectively "Defendants"), complains and alleges as follow:

## **TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ...................................................................................................... 1

II. JURISDICTION AND VENUE ................................................................................. 6

III. PARTIES ................................................................................................................ 6

IV. FACTS COMMON TO ALL COUNTS .................................................................. 8

    A.    The Laws-In-Dispute .................................................................................. 8

    B.    NYPWA-Members ..................................................................................... 10

        i.    Pet Shops ....................................................................................... 10

        ii.    Class A USDA Licensees ............................................................... 12

        iii.    Class B USDA Licensees ............................................................... 14

        iv.    USDA Exempt Licensees (Hobby Breeders) ................................. 17

        v.    Veterinarians ................................................................................. 18

        vi.    Pet Owners .................................................................................... 19

V. THE LAWS ARE PREEMPTED BY THE ANIMAL WELFARE ACT ............... 21

VI. THE LAWS ARE PREEMPTED BY STATE LAW .............................................. 22

    A.    Banning Sales Of Dogs And Cats From Pet Shops Is Preempted By State
        Law ............................................................................................................ 22

    B.    The Laws Are Preempted By State Laws Governing The Practice Of
        Veterinary Medicine ................................................................................. 23

        i.    Mandatory Sterilization Violates Professional Standards Of Care .......... 24

        ii.    Pet Shop Environment Presents Known Surgical Risks ........................... 29

VII. THE LAWS VIOLATE THE DUE PROCESS CLAUSE ...................................... 30

VIII. THE LAWS VIOLATE THE EQUAL PROTECTION CLAUSE BY SELECTIVELY
    DISCRIMINATING AGAINST PLAINTIFF .................................................... 31

    A.    Rescues And Shelters Are Similarly Situated To And Compete With Pet
        Shops ......................................................................................................... 33

i

B. Retail Rescues Are The New Pet Shops ............................................................ 36

C. Defendants Violate The Equal Protection Clause By Maliciously Targeting Plaintiff To Cause Harm ...................................................................... 38

IX. THE LAWS VIOLATE THE COMMERCE CLAUSE ........................................................ 42

A. The Laws Violate The Commerce Clause By Barring Entry To City Markets And Placing A Burden On Interstate Commerce ............................................... 43

B. The Laws Violate The Commerce Clause By Targeting Out-Of-State "Puppy Mills" ......................................................................................................... 43

C. The Laws Are Under-Inclusive Because Animals From Random Sources Pose A Higher Risk Of Infection And Congenital Disorders Than Pets From Pet Shops .................................................................................... 47

D. The Laws Violate The Commerce Clause Because They Are Overly Broad ....... 51

X. DEFENDANTS VIOLATE 42 U.S.C. § 1985 BY CONSPIRING AND COLLUDING ....... 53

COUNT I DECLARATORY RELIEF (Federal Preemption) (Against All Defendants) ............ 59

COUNT II DECLARATORY RELIEF (State Preemption) (Against All Defendants) ............... 61

A. Banning Sales Of Dogs And Cats From Pet Shops Is Preempted By State Law ............................................................................................................. 61

B. Local Laws 5 And 7 Conflict With Pet Shop Requirements In State Laws ......... 64

C. Local Laws 5 And 7 Are Preempted By State Laws Governing The Practice Of Veterinary Medicine ............................................................................... 66

D. Veterinarians Cannot Comply With Local Laws 5 And 7 And Other State Laws ............................................................................................................ 68

COUNT III 42 U.S.C. § 1983 & DECLARATORY RELIEF (Substantive Due Process) (Against All Defendants) ..................................................................... 69

COUNT IV 42 U.S.C. § 1983 & DECLARATORY RELIEF (Procedural Due Process) (Against All Defendants) ..................................................................... 71

COUNT V 42 U.S.C. § 1983 & DECLARATORY RELIEF (Equal Protection Violation) (Against All Defendants) ..................................................................... 72

COUNT VI 42 U.S.C. § 1983 & DECLARATORY RELIEF (Commerce Clause) (Against All Defendants) ..................................................................................... 75

COUNT VII 42 U.S.C. § 1985 (Against Defendants Crowley and Johnson) ............................. 78

COUNT VIII DECLARATORY RELIEF VIOLATION OF THE STATE CONSTITUTION
(Art. I, § 11 of the New York State Constitution) (Against All Defendants) ................... 80

PRAYER FOR RELIEF ........................................................................................................ 81

JURY TRIAL DEMANDED ................................................................................................. 82

iii

## I. **INTRODUCTION**

1.      The New York Pet Welfare Association, Inc. ("NYPWA") is an association of pet stores, dog and cat breeders and dealers, veterinarians, and pet owners, who serve the public by providing healthy, specially bred dogs and cats to loving homes throughout the country, including those in the City.  NYPWA's mission is to ensure that pet owners continue to have access to healthy, humanely treated, purebred puppies[1] and kittens; educate the public and policy makers about the responsible pet industry; educate pet industry professionals to foster compliance with applicable pet care laws, and advocate for responsible public policy that promotes healthy puppies and other pets, as well as profitable businesses in New Jersey, New York and beyond.

2.      The City has adopted laws, Local Law 5[2], as amended by Int. 761, and Local Law 7 (the "Laws"), that ban out-of-state dog and cat breeders and dealers from access to the City pet market, in violation of the Supremacy Clause, Due Process Clause and Commerce Clause of the United States Constitution.  The Laws impermissibly favor the unregulated "Retail Rescue" industry with reported revenues, collectively, of hundreds of millions of dollars, over the highly regulated out-of-state businesses that provide healthy puppies and kittens to pet stores in the City ("Pet Shops"), in violation of the Commerce Clause and Equal Protection Clause of the United States Constitution and the New York State ("State") Constitution.  The Laws selectively discriminate against the Pet Shops and the sources they rely upon to provide healthy puppies and kittens, an impermissible violation of the Equal Protection Clause.  The Laws are preempted by and conflict with State laws governing the practice of veterinary medicine by replacing professional judgment and discretion, required by the State, with the City's mandate to sterilize

---

[1] Puppies mean "puppies and kittens."
[2] Reference to Local Law 5 throughout the First Amended Complaint incorporates amendments in Int. 761 which appears to be renamed as Local Law 53.  Local Law 53 was not available at the time of filing.

dogs and cats with no real exemptions.  The Laws deny owners the right to informed consent before a veterinarian performs surgery that can negatively and irreversibly impact the life, health and longevity of their pets.  The Laws are preempted by and conflict with State laws that prohibit local jurisdictions from enacting laws that essentially ban the sale of healthy dogs and cats from reputable sources.  The Laws effectively ban sales of all dogs and cats from Pets Shops by depriving Pet Shops of access to puppies and kittens from their well-established federally-licensed sources, and requiring mandatory sterilization which violates and conflicts with State veterinary licensing requirements and State animal cruelty statutes.  Pet Shops rely on puppy sales to remain profitable.  Without a source of puppies to sell, Pet Shops will go out of business.

3.      NYPWA-members have been impermissibly deprived of their federally-granted pet dealer licenses by the City, violating their rights under the Supremacy Clause and Due Process Clause of the United States Constitution by banning sales from those licensees to Pet Shops and prohibiting the use of those licensees.  Plaintiff consists, in part, of Class B USDA licensees ("Distributors" or "Brokers"[3]) who are licensed by the United States Department of Agriculture ("USDA") to buy and sell animals in interstate commerce.  USDA enforces the comprehensive federal pet dealer licensing scheme established by Congress as set forth in the Animal Welfare Act, 7 U.S.C. 2131, *et seq*. ("AWA").   The USDA has primary oversight to enforce the AWA.

4.      Local Law 5, which bans sales to City Pet Shops from all Class B USDA licensees is preempted by the AWA.  By excluding access to the City's pet market, Local Law 5 renders the Class B license null and void within the City, and terminates licensees' property

---

[3] As will be addressed in greater detail below, Class A USDA licensees refers to "Breeders."  "Hobby Breeders" are breeders who are explicitly exempt from the requirements of USDA licensure. Class B USDA licensees refer to (1) "Distributors," who purchase and take possession of puppies and kittens and re-sell them to pet stores and others; and (2) "Brokers," who act as the intermediary between Breeder and Pet Shops to effectuate the sale and transportation from a Breeder or Hobby Breeder to a Pet Shop but do not take possession of the animals.

interest in their federal license.  In short, Class B licensees have an absolute right based upon their license from the USDA to sell pets to City Pet Shops and New York City's Local Law 5 deprives them of that right.

5.      Local Law 5 also impermissibly deprives Class A USDA licensees ("Breeders") who sell exclusively to Class B USDA licensees of their USDA-granted license to breed and sell animals in the City.  Local Law 5 prohibits sales from Breeders to Pet Shops who sell indirectly through Class B USDA licensees, effectively terminating their access to the City's pet market. The Law also deprives breeders exempt from USDA licensure ("Hobby Breeders") of access to City Pet Shops through Class B USDA licensees.  Many Breeders and Hobby Breeders rely on Class B USDA licensees to sell their puppies and kittens, and would go out of business if that resource were no longer available.

6.      The City pet market represents a significant source of revenue to many Distributors, Brokers, Breeders and Hobby Breeders who will suffer economically from the Laws which impermissibly burden interstate commerce.

7.      In addition to burdening the flow of interstate commerce and discriminating against extraterritorial pet dealers, the Laws impermissibly favor local in-state economic interests (i.e., Shelters and Retail Rescues) over out-of-state sources relied upon by Pet Shops.  The Retail Rescue industry has emerged since Hurricane Katrina as a multi-million dollar industry, with income reported in the millions from donations collected from every state across the country, generated by national advertisement and marketing campaigns and from sales of pets imported into the City from around the country.  Regardless of their non-profit status, Retail Rescue functions as profit-making entities participating in interstate commerce in the pet trade as defined

by Congress, as set forth in the Constitution of the United States, and as determined by the Supreme Court of the United States.

8.       The Laws also impermissibly violate the Commerce Clause because they do not advance a legitimate local interest.  Their intent is to regulate dog breeding outside the City in other states, including those in the Midwest.  Even if the Court were to find this a legitimate local interest, reasonable non-discriminatory alternatives exist.  The Laws are overly broad by banning sales from responsible Hobby Breeders, Breeders, Pet Dealers and Pet Shops, and are under-inclusive by permitting the sale of dogs, imported from the very worst facilities in other states and countries, exposing New Yorkers and animals in the City to infectious and zoonotic diseases, which, like rabies, are fatal.

9.       The Laws impermissibly violate the Equal Protection Clause by favoring one source of puppies (Shelters and Retail Rescues) over others (Pet Shops) and selectively discriminating against the former with malicious intent to cause them harm.  Pets Shops, Shelters and Rescues are similarly situated entities where customers go to buy their pets.  All entities transfer ownership of dogs and cats to New Yorkers, and all are profitable.  Pet Shops are banned from buying puppies from certain sources, but Shelters and Rescues are expressly exempt from the sourcing bans and could effectively distribute pets from the banned sources.  Pet Shops are required to sterilize all puppies before sale that weigh at least two pounds and are eight weeks old with no other exemptions, but can sell unsterilized puppies from Rescues and Shelters as long as the Pet Shop does not own those pets or make a profit from those sales.  Rescues offering dogs and cats outside of Pet Shops have no sterilization mandates and stand-alone Shelters are exempt from mandatory sterilization requirements.

4

10.     Local Law 7 is preempted by and conflicts with the State's laws governing licensed veterinarians.  The Law jeopardizes a veterinarians' State license by mandating the sterilization of all dogs and cats before sale, without independent professional judgment.  The State requires veterinarians to use their independent professional judgment when determining the treatment and care of their patients, in consultation with, and consent from their clients.  The City has replaced independent professional judgment with its mandate to sterilize dogs and cats, without any consideration of the patient's health.  If a veterinarian performs a surgery knowing it will imperil a patient's health, she is at risk of losing her license to practice veterinary medicine, and is exposed to liability for veterinary malpractice and charges of animal cruelty.

11.     Defendants cannot withstand the heightened scrutiny required when Laws selectively discriminate against a select class−Pet Shops and their sources−maliciously targeted to cause them harm.  Defendants cannot successfully defend against the claims that they intentionally and illegally interfered with NYPWA-members' rights to engage in Congressionally-sanctioned commerce amongst and within the United States, their rights to their property interests, and equal protection under the Constitution of the United States and the New York State Constitution.

12.     This action arises from Defendants' violation of the rights of the members of the NYPWA, including those with valid USDA and/or State and City licenses, by adopting the Laws, effective on June 1, 2015, which cause immediate and irreparable harm which cannot be compensated by monetary damages.  Plaintiff also seeks declaratory relief that the relevant sections of the Laws violate these rights and are therefore invalid.  Plaintiff also seeks monetary and punitive damages.

5

## II. JURISDICTION AND VENUE

13.     This action is brought pursuant to 42 U.S.C. §§ 1983, 1985, and 1988, and the

First and Fourteenth Amendments to the Constitution of the United States.  The Court has

subject matter jurisdiction over this case pursuant to: (1)  28 U.S.C. §§ 1331, 1343(a)(3), and

1343(a)(4), as this is a civil action arising under the Constitution of the United States and the

laws of the United States; (2)  28 U.S.C. §§ 2201, and 2202 to declare the Laws-in-Dispute are

invalid, and to grant all further relief deemed necessary and proper; and (3)  28 U.S.C. § 1367(a)

over the supplemental claims arising under the New York State Constitution and State laws.

14.     This Court has personal jurisdiction over Defendants because they have in the

past and are currently conducting business in this judicial district.

15.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because

Defendants reside in this district and a substantial part of the events giving rise to the claim

occurred in this district.

## III. PARTIES

16.     Plaintiff, the NYPWA is a non-profit 501(c)(6) trade association incorporated in

the State of New Jersey, pending Internal Revenue Service non-profit status, whose members

include pet shop owners in the City and other jurisdictions, USDA Class A and B licensees,

USDA exempt breeders, veterinarians and pet-owners.

17.     NYPWA members include owners, managers, and employees of at least

seventeen (17) small family-owned Pet Shops in the City, collectively working with and selling

pets for hundreds of years.

18.     NYPWA-members include at least four (4) Class A USDA licensees, located in

the Midwest.  Class "A" USDA licensee ("Breeder") means a person . . . whose business

involving animals consists only of animals that are bred and raised on the premises in a closed or

6

stable colony and those animals acquired for the sole purpose of maintaining or enhancing the breeding colony.  9 CFR § 1.1.

19.     NYPWA-members include at least three (3) Class B USDA licensees, located in the Midwest.  Class "B" USDA licensee ("Distributor") means a person . . . whose business includes the purchase and/or resale of any animal.  9 CFR § 1.1.

20.     NYPWA-members include at least one USDA exempt breeder ("Hobby Breeder").  A Hobby Breeder is any person who sells or negotiates the sale or purchase of any animal except wild or exotic animals, dogs, or cats, and who derives no more than $500 gross income from the sale of such animals during any calendar year and is not otherwise required to obtain a license; and any person who maintains a total of four or fewer breeding female dogs, cats, and/or small exotic or wild mammals . . . and who sells, at wholesale, only the offspring of these dogs, cats, and/or small exotic or wild mammals, which were born and raised on his or her premises, for pets or exhibition.  9 CFR § 2.1 (3)(i)-(iii).

21.     NYPWA-members include at least fourteen (14) veterinarians, including twelve (12) licensed to practice in New York.

22.     NYPWA-members include at least two (2) pet owners who purchased animals from Pet Shops.

23.     Defendant City is a municipal entity created and authorized under the laws of the State of New York.

24.     Defendant Council is the legislative body for the City.

25.     Defendant Johnson is a New York City Councilman and Chairman of the Council's Committee for Health co- sponsor of Proposed Introduced 0055-2014, Local Law 5 now Local Law 53, and Proposed Introduced 0136-2014, now Local Law 7.

26.      Defendant Crowley is a New York City Councilwoman and prime sponsor of Proposed Introduced 0055-2014, now Local Law 5 and Proposed Introduced 0136-2014, now Local Law 7.

## IV. FACTS COMMON TO ALL COUNTS

27.      The term "puppy mills" was defined by USDA's Inspector General as "large-scale dog breeders that failed to provide humane treatment for the animals under their care." Attached hereto as **Exhibit 1** is a true and correct copy of the Audit Report, Animal and Plant Health Inspection Service Animal Care Program Inspections of Problematic Dealers, 33002-4-SF, May 2010, at pages 1-3.

28.      "Puppy mill" is term used by animal rights organizations ("ARO's") to describe all commercial dog breeders, intermediaries licensed by USDA as Class B distributors, Pet Shops, and anyone else who makes a living breeding, selling, and transporting puppies.  The ARO's believe it is wrong to breed, raise and sell dogs for a profit.

29.      Linda B. Rosenthal ("Rosenthal") is a member of the New York State Assembly representing the 67th Assembly district, which includes the Upper West Side and parts of the Clinton/Hell's Kitchen neighborhood in Manhattan and sponsor of A.740 (the "Puppy Mill Bill"), now Chapter 553 of the Laws of 2013 and Chapter 5 of the Laws of 2014.

A.      **The Laws-In-Dispute**

30.      The Laws-in-Dispute include: (1)  Proposed Introduced 0136-2014 ("Int. 136") now Local Law 7, titled "a Local Law to amend the administrative code of the city of New York, in relation to the spaying, neutering and licensing of animals sold in Pet Shops," requires the mandatory sterilization of dogs and cats prior to sale from Pet Shops, without exception, as long as the animal is at least eight weeks old and weighs at least two pounds; (2)  Proposed Introduced 0055-2014 ("Int. 55"), Local Law 5, amended by Proposed Introduced 0761-2015 ("Int. 761"),

now Local Law 53, titled "a Local Law to amend the administrative code of the city of New York, in relation to regulating Pet Shops," restricts the source of puppies which Pet Shops traditionally rely upon−Class A USDA licensees, Class B USDA licensees, and USDA exempt breeders.  Attached hereto as **Exhibit 2** is a true and correct copy of Local Law 7 downloaded from Council's website.  Attached hereto as **Exhibit 3** are true and correct copies of Local Law 5 and Int. 761 downloaded from Council's website.

31.     Local Law 5 bans Pet Shops from purchasing from Class B USDA licensees, Hobby Breeders and City-exempt breeders (defined as "breeders who sell or offer to sell directly to consumers fewer than twenty-five dogs or cats per year that are born and raised on the breeder's residential premises.")  Local Law 5 § 17-371; Int. 761 § 17-1702.

32.     Local Law 5 incorporates minimum standards of animal care requirements that the State requires and the Pet Shops already comply with.  Local Law 5 § 17-1705.

33.     Local Law 5 allows City-exempt breeders to sell to consumers in the City without a permit or complying with mandatory sterilization requirements and record keeping requirements.

34.     Local Law 5 exempts from the term "pet shop" "duly incorporated humane societies dedicated to the care of unwanted animals that make such animals available for adoption, whether or not a fee for such adoption is charged."  Local Law 5 § 17-371.  "A person who allows an animal shelter or animal rescue group, as such terms are defined in section 17-802 of chapter eight of this title, to use such person's premises for the purpose of making animals available for adoption [s/he] shall not be deemed a pet shop as a result of such activity so long as such person does not have an ownership interest in any of the animals being made available for adoption, and does not derive a fee for providing such adoption services."  Int. 761 § 17-371.

35.     Local Law 5 provides "[e]xemptions for shelter and rescue partners.  A pet shop that allows an animal shelter or animal rescue group to use such pet shop's premises for the purpose of making animals available for adoption shall be exempt from the provisions of this chapter with respect to such animals, provided such pet shop does not have an ownership interest in such animals."  Int. 761 § 17-1706.

36.     Local Law 5 requires a Pet Shop to apply for or renew a permit and to submit "[a] certification, executed under penalty of perjury that the applicant has not knowingly sold any animal obtained from a source prohibited pursuant to 17-1702 of this title.  For an application submitted proper to June 1, 2017, such certification shall be made with respect to animals sold on or after June 1, 2015 . . ."  Local Law 5 § 17-373 (d) (5).

37.     Local Law 5 punishes Pet Shops by requiring draconian document retention periods and by providing for cumulative fines that are additionally and unreasonably punitive.  Local Law 5 § 17-1701.

**B.     NYPWA-Members**

**i.     Pet Shops**

38.     The Pet Shops, dedicated to the sale of healthy and properly raised puppies, and sometimes kittens, are licensed by the Department of Agriculture & Markets in New York State ("Ag & Mkts") and the City, are inspected annually by each, and maintain valid licenses.  Attached hereto as **Exhibit 4** is a true and correct copy of Ag & Mkts list of licensees downloaded from www.agriculture.ny.goc/petdealer/petdealerextract.asp.

39.     The Pet Shops purchase puppies from Breeders, Distributors, or Brokers with valid state and federal licenses or those exempt from licensure as permitted by governing state and federal law.  Most of the Pet Shops rely exclusively or primarily on out-of-state Class B

USDA licensees to provide healthy, well-cared for puppies purchased from Class A USDA licensees or Hobby Breeders.

40.     The Pet Shops do not buy puppies from substandard breeders who subject a sire, dam and/or puppies to inhumane or unsafe conditions, and would stop buying puppies from any breeder who was not providing proper care to their dogs and puppies.

41.     The Pet Shops purchase puppies no younger than eight weeks of age (as required by State law), and sell them generally before they are twelve weeks of age.  The Pet Shops are designed to house puppies of that age safely.  Some shops have invested at least $100,000 to renovate their puppy housing and have a security camera system to view the puppies at all times.  Puppy sales from Pet Shops comprise 28-92% of their business, without which their businesses would not be profitable.  Class A and Class B USDA licensees and Hobby Breeders traditionally have provided Pet Shops with eight week old puppies, and their facilities and transport vehicles are specially outfitted to provide for the puppies' health and welfare.  Pet Shops take special precautions to take care of and play with the puppies at all times, and even take them home at night when the Shop is closed for the holidays or snow storms.

42.     The Pet Shops retain veterinarians with veterinary facilities in the City to examine the puppies shortly after they arrive at the Pet Shop and before sale.  Veterinarians also provide a written program of veterinary care, make regular visits to the Pet Shop's premises, prescribe or administer preventive medical care, provide for emergent care when needed, ensure the puppies receive adequate exercise, and insert a microchip if one is not present or active.

43.     All Pet Shops selling dogs and cats provide warranties that give purchasers the right to return the dog or cat within fourteen days if diagnosed by a veterinarian to be unfit for

sale because of a contagious disease . . . and obtain another pet, or be reimbursed for the cost of
the pet, or at least some of the medical costs.  N.Y. Gen. Bus. § 753.

### ii.     Class A USDA Licensees

44.     USDA maintains a publicly accessible database of Class A USDA licensees with
inspection reports at https://acissearch.aphis.usda.gov/LPASearch/faces/Warning.jspx.  On
information and belief, there are no Class A USDA licensees in the City; there are thirty-two
(32) listed active Class A USDA licensees in the State; and there are 1710 active Class A USDA
licensees outside of New York State as of September 27, 2014.  The 573 and 22 Class A USDA
licensees located in Missouri and Pennsylvania, respectively, must comply with each state's laws
governing the breeding and care of dogs.

45.     NYPWA-members currently include at least four Class A USDA licensees.
Membership continues to grow.  Many Breeders only sell to Class B USDA licensees whom they
rely upon to maintain their viable businesses.  One Class A Member ("Member 1") is semi-
retired and has been breeding and selling kittens and puppies for over 40 years with a valid
USDA license.  Her grandmother also bred dogs and as a child, animals were her best friends.
Member 1 decided to start her kennel so she could work from home and raise her children.  She
has registered dogs and cats, and breeds and sells Cornish Rex, Bermese, Toy Poodles, Shih
Tzu's, Toy Schnauzers and Cockapoos.  Most of her time is spent playing with her dogs and cats,
and socializing the puppies and kittens. She hires a few people, part time, to help with these
tasks.  Member 1 generally breeds once a year, or longer, depending on the individual animals'
heat cycles.  She keeps most of her retired breeding animals and will accept back any pets if
there is a problem.  If she cannot care for these animals herself, she works with a local rescue to
find them homes.  She sells and distributes her animals exclusively through a Class B USDA
licensee.  Approximately, 50% of her puppies and kittens are sold indirectly to Pet Shop(s) in the

City.  Previously, she used to sell directly to Pets Stores and other customers, but can no longer manage the logistics and costs required.  The profits she gets from sales to the City pay for her living expenses and medical bills, without which she will need government assistance.

46.     Other Class A USDA licensees members ("Member 2") are a married couple from Nebraska, who breed and sell Maltese, Yorkies and Shiba Inus, and have been doing so for over a decade.  These members are avid and devoted dog-lovers who needed an additional source of income since their retirement.  At first, they bred and sold puppies directly to customers, but could not afford the additional staff, time or logistics needed to sell retail.  They then built the kennel of their dreams and started breeding and selling puppies to Hunte, a Class B licensee.  Close to 25% of their puppies are sold to Pet Shops in the City through Hunte.  Cutting off access to the City would significantly affect their bottom line and make it difficult for them to stay in business.  Since they rely on their income from the kennel to pay bills, they would have to find other jobs.  Finding other jobs for these members would be practically difficult due to their age.  These members spend hundreds of hours playing with and socializing each puppy every day.  They work with two rescue groups to provide homes for any puppy that is healthy but not perfect.  They gave away six puppies last year to people on their waiting list who could not afford to buy his puppies otherwise.  It would not be feasible for these members to keep puppies until they were four or five months old.  They believe keeping puppies at the kennel for that long would be harmful to their development.  Puppies need to bond with their owner between 8–14 weeks of age and start their training, including potty training.  Keeping puppies at the kennel longer would be harmful to the puppies, the owners, and would make it impossible for these members to continue their business.

13

47.     NYPWA-member James David Miller is co-owner of Monark Puppies in Missouri and has active USDA and Missouri breeder licenses.  Mr. Miller has been breeding puppies for 11 years and currently has 65 adult dogs, including 50 females.  He sells a majority of his puppies' retail to customers and the balance to pet stores, some through Distributors.  He begins weaning his puppies between 5-6 weeks of age, and provides comprehensive preventive veterinary care as directed and administered by his veterinarian.  Monark Puppies is a small family-run business employing 4 family members and 2 additional employees.  As a commercial dog breeder in Missouri, Mr. Miller has been falsely labeled a "puppy mill" which has harmed his reputation and good will.  Attached hereto as **Exhibit 5** are true and correct copies of Mr. Miller's webpage and his USDA and Missouri breeder licenses.

**iii.     Class B USDA Licensees**

48.     Class B USDA Distributor licensees who sell to Pet Shops purchase, house, and transport puppies from Class A USDA licensees and Hobby Breeders to their facilities for veterinary examinations and preventive medical care before transporting them in specially-designed vehicles built to care for the health and welfare of the puppies during transport to the Pet Shops.  Class B USDA Broker licensees purchase and re-sell animals but do not take possession of the animals.

49.     USDA maintains a database of Class B USDA licensees with inspection reports on its website at https://acissearch.aphis.usda.gov/LPASearch/faces/Warning.jspx.  On information and belief there are no Class B USDA licensees in the City; there are four (4) listed active Class B USDA licensees in New York State; and there are 260 active Class B USDA licensees outside of New York State.

50.     Pet Shops predominantly purchase puppies from Class B USDA licensees outside of New York State.  Class B USDA licensees provide an important service for Class A USDA

licensees, Hobby Breeders and Pet Shops by matching up the puppies and kittens Pet Shops want for their customers with reputable breeders who breed and raise healthy, specially bred puppies and kittens often exceeding the standard of care required by federal and local laws.  The logistics, time, and resources needed to make these sales possible exceeds the capability of the breeders who sell to Class B USDA licensees.  In addition to reviewing USDA inspection reports, Pet Shops also rely on their Distributors and Brokers to visit the breeders' facilities personally and ensure that the animals are properly cared for.

51.     The Hunte Corporation ("Hunte"), a Distributor and NYPWA-member, has its headquarters in Goodman, Missouri, and was founded by Andrew Hunte in 1991.  Hunte has been licensed, under its current and former names, as a Class B USDA licensee since November 18, 1991 and has had only one minor indirect citation on an inspection report in 2006.  Hunte carefully selects puppies from professional breeders who meet or exceed federal requirements based on comprehensive criteria including a complete musculoskeletal examination; provides Pet Shops with a four-generation pedigree including sire and dam information for each registered puppy; microchips and enrolls each puppy in the AKC Reunite Animal Recovery Program; provides a five year warranty covering hereditary and congenital defects; and adds additional reimbursements and support.  Hunte buys puppies from Hobby Breeders who they also visit yearly and provide the same guidance and oversight they have for their Class A breeders.  Hunte purchases puppies from Class A USDA licensees and Hobby Breeders (20-30%), as long as they comply with their rigorous standards of care.

52.     Hunte maintains a full-time veterinary staff, veterinary technicians, and specialized kennel staff who monitor the puppies 24 hours a day, 7 days a week and employs 150 full time staff.  Puppies are examined when they arrive at Hunte, receive preventive care and

medical care when needed, and are housed in a state-of-the art kennel designed and operated to minimize stress, prevent infection from air-borne viruses and bacteria, and keep the puppies comfortable. Puppies are transported to Pet Shops in vehicles specifically designed for puppy safety and comfort, driven by specially trained drivers who work in teams to provide continual oversight of the puppies, ensure that food and water is available, and that the puppies are clean and comfortable. Hunte far exceeds standards required by federal or state law governing the standard of care required. Attached hereto as **<u>Exhibit 6</u>** is a true and correct copy of the Hunte Corporate Profile.

 53. Hunte provides healthy, well-bred puppies from breeders that they have known for decades from 22 states. Hunte visits these breeders annually and works with them to provide the very best puppies to their pet store customers and ultimately to families across the country. Hunte understands what breeders need to remain in the business of providing the nation with puppies that enrich everyone's lives. They organize the breeder community though the Breeder Legal Defense Fund and other programs that pay for their partnering breeder's membership in professional organizations that foster industry-wide high standards. Hunte also provided training for breeders, since they are so familiar with breeders' businesses and needs.

 54. Hunte has purchased puppies from 787 distinct Class A USDA Breeders in 22 states over the past three years. During the past three years Hunte sold 2086 total pups they purchased from Breeders and Hobby Breeders, directly into one of the five NYC boroughs. Without access to the City Pet Shops Hunte and other Class B USDA licensees will lose valuable market share in the City and will suffer irreparable harm from the malicious attacks on their reputation and character by Defendants. Hunte stands to suffer significant economic losses as a result of the City ban. Additionally, the ban jeopardizes one of Hunte's transportation routes,

which could result in the termination of up to 20% of Hunte's employees directly and through backlash effects.

### iv.    USDA Exempt Licensees (Hobby Breeders)

55.    Hobby Breeders may be licensed by their state or jurisdiction even if they are exempt from USDA licensing.  Missouri licenses all breeders, "other than a hobby or show breeders, engaged in the business of breeding animals for sale or for exchange in return for a consideration, and who harbors more than three (3) intact females for the primary purpose of breeding animals for sale."  2 CSR 30-9.010.  Pennsylvania also requires breeder licensing.  Attached hereto as **Exhibit 7** is a true and correct copy of a description of the Pennsylvania Department of Agriculture's ("PDA") Kennel Licensing law downloaded from http://www.agriculture.state.pa.us/portal/server.pt/gateway/PTARGS_0_2_75292_10297_0_43/AgWebsite/ProgramDetail.aspx?name=Kennel-Licensing&navid=12&parentnavid=0&palid=62&.

56.    Hobby Breeders sell puppies to Pet Shops directly or through Class B USDA licensees.

57.    Hobby Breeders selling puppies indirectly to Pet Shops are screened by Class B USDA licensees regularly.

58.    Hunte regularly screens all breeders and insures any state or federal claimed exempt status of Hobby Breeders by tracking breed registries to confirm the number of the breeders' dams complies with the law.

59.    Michael Glass, a Hobby Breeder in Pennsylvania, and Secretary of the NYPWA has been an advocate for dog breeders in the private/hobbyist and commercial/professional dog breeding for almost 40 years.  He owns four (4) breeding females and one (1) breeding male, all

17

Newfoundlands.  Attached hereto as **Exhibit 8** is a true and correct copy of Glass's website,

www.latinofcourse.net.

60.     Local Law 5, as adopted, prohibits Pet Shops from purchasing dogs and cats from

Hobby Breeders.

61.     Hobby Breeders will lose valuable market share and will suffer irreparable harm

from the malicious attacks on their reputation and character by Defendants.

**v.     Veterinarians**

62.     At least thirteen (13) veterinarians serve on the NYPWA's Veterinary Advisory

Council ("VAC") as professional members of the NYPWA.  The VAC was formed to provide

advice about issues that concern the health and welfare of pets.

63.     Veterinarians are retained by Pet Shops, Class A and B USDA licensees as

required, by federal, state and local laws.

64.     Veterinarians, retained by Class A and Class B USDA licensees and Hobby

Breeders who transport dogs and cats to the City from other states, must:

> examine each animal within 30 days of entry of the dog or cat into the State of
> New York; sign a health certificate which lists the date of examination, the breed,
> sex and age of the dog or cat, the state . . . of origin and the full name and
> complete post office address of the consignee and consignor; . . . [and shall certify
> in writing that] the examination revealed no clinical evidence of infectious or
> communicable disease, including parasites and fungi, and that to the best of the
> veterinarian's knowledge, the dog or cat has not recently been exposed to such
> infectious or communicable disease.

1 NYCRR 65.2, 1 NYCRR 65.3

65.     Veterinarians are required to supervise the care of the pets in Pet Shops in the

City.

66.     Veterinarians provide care to animals pursuant to a valid veterinarian-client-

patient relationship, which requires professional judgment for any diagnosis, course of treatment,

and procedure, on a case-by-case basis, which they are required to discuss with and receive informed consent from each owner before proceeding.  Prof'l Practice NYS, Guideline § 5.8.

67.     Veterinarians are required to determine what medical or surgical cases they should accept in their professional practice based on an independent assessment of the needs of each patient.  NY Educ § 6701, *et seq*.

68.     The course of treatment to be provided to each patient is to be determined in consultation with the client.  Prof'l Practice NYS, Guideline § 5.8.  While informed consent is not expressly required in State law for veterinary patients, it is required before sterilization of human patients.  NYC Code § 17-401.

69.     Upon information and belief, State Attorney General Eric T. Schneiderman believes that consumers who purchase animals should make that important decision in an informed manner.  "New Yorkers value their pets as companions and are entitled to know that they came from sources that treated them in a safe and healthy manner."  Attached hereto as **Exhibit 9** is a true and correct copy of Attorney General Schneiderman's Press release downloaded from http://www.ag.ny.gov/press-release/ag-schneiderman-offers-assistance-local-governments-drafting-rules-curb-animal-abuse.

**vi.     Pet Owners**

70.     Owners of purebred and specially-bred dogs and cats rely on Pet Shops to provide them with healthy, properly bred puppies.  Many City residents do not have a car and could not travel outside of the City to purchase a pet.  Pet Shop customers do not know dog and cat breeders and rely on Pet Shops to source their animals based on their preferences for specific physical and behavioral traits.

71.     Owners want to buy puppies less than fourteen weeks old—the optimal age for establishing the human-animal bond.  According to Dr. Ann Hohenhaus of the Animal Medical

19

Center in Manhattan, "puppies need to socialize with humans within the first 14 weeks of their

lives or they will be at a high risk of developing behavioral problems and become unwanted

pets."  Attached hereto as **Exhibit 10** is a true and correct copy of the Council's Committee on

Health report dated June 11, 2013.

72.     Delaying sales of puppies beyond the optimal age for socialization traumatizes the

animals and increases the prevalence of undesirable behavioral traits that decrease the likelihood

of successful lifelong pet ownership such as fear biting, inappropriate aggression and weak social

bonding with humans.

73.     Consumers are entitled to informed consent, before purchase, of any procedure

that could result in short and long term illness or death of their pets.  This is particularly true for

elective procedures that could permanently lead to increased incidence of disorders and cancer

which will increase veterinary costs over the course of the animal's life, and also lead to

decreased longevity.

74.     Consumers that are denied access to purebred and specially-bred puppies will turn

to other local sources for those purchases.  Rescues routinely advertise and sell imported

puppies, including purebreds that they obtain from unlicensed or substandard facilities from

across the country and world.  These imports have the highest risk of harboring and transmitting

infectious, contagious diseases and suffering from congenital disorders resulting from

irresponsible breeding.  Unlike Pet Shops, which are required to provide warranties against

infectious diseases and congenital disorders, Shelters and Rescues have no such requirements.

Rescues and Shelter dogs are sold "as is" and owners are on the hook for veterinary care required

for pets suffering from such maladies.  Attached hereto as **Exhibit 11** are true and correct copies

of the North Shore Animal League's webpages at http://www.animalleague.org/rescue/pet-rescue-programs/puppy-mill-rescue/puppy-mill-rescue-archives/.

75.     Consumers will be irreparably harmed by being denied access to purebred or specially-bred pets at Pet Shops who provide highly regulated healthy pets and instead getting their pets from random, unknown sources with a greater risk of exposure to infectious, sometimes fatal diseases.

## V. <u>THE LAWS ARE PREEMPTED BY THE ANIMAL WELFARE ACT</u>

76.     Plaintiff repeats and realleges the foregoing allegations as if more fully set forth at length herein.

77.     Class A and B USDA licensees have a license issued by USDA to breed and sell animals, and purchase and resell animals, respectively, under the AWA.

78.     The ban against sales to Pet Shops from Class B USDA licensees was based on allegations that Class B USDA licensees "are the dark middlemen of the pet industry . . . shroud[ing] the source of animal[s] sold in a mystery preventing municipalities from protecting consumers and animals . . ."  Attached hereto as **Exhibit 12** is a true and correct copy Committee Hearing Transcript dated November 24, 2014; *see* page 126, lines 10-12.  On November 24, 2014, at the Committee on Health hearing, Johnson said "Brokers are intermediaries who obtain dogs and cats from breeders, and provide them to pet stores.  Several witnesses at our last hearing testified that brokers can be bad actors who obscure the true source of an animal and provider [sic] cover for puppy and kitten mills."  *Id*., at page 7, line 6-11.

79.     There were no allegations that any Class B USDA licensee failed to provide animals at least the minimum standard of care required in 7 U.S.C. § 2133 of the AWA or 9 C.F.R. §§ 3.1-3.19 before denying them access to the City pet market.

21

## VI. <u>THE LAWS ARE PREEMPTED BY STATE LAW</u>

80.     Plaintiff repeats and realleges the foregoing allegations as if more fully set forth at length herein.

**A.     <u>Banning Sales Of Dogs And Cats From Pet Shops Is Preempted By State Law</u>**

81.     Pet Shops' business model depends upon the purchase of puppies and kittens at least eight weeks of age and sales of those animals within a few weeks, routinely by twelve weeks of age.  Class A USDA licensees and Hobby Breeders breed, raise and sell puppies and kittens at eight weeks of age for the Pet Shop market.  Retaining ownership of those animals for a longer period of time is not feasible for the breeder, would require a dramatic increase in the scale of their business, would require more employees to adequately care for and continue to socialize the animals, while continuing their breeding operations.  Class B licensed Distributors have specially designed facilities and transportation vehicles to care for puppies and kittens, not older animals.  The entire market revolves around sales of puppies and kittens from eight to around twelve weeks of age.

82.     No alternate markets can provide purebred or specially bred dogs for Pet Shops to obtain for sale.  There are no reliable markets of older purebred or specially bred dogs to sustain dog sales from Pet Shops, assuming owners would be interested in purchasing older animals.  Pet Shops are not equipped to house older animals.  The only other source of dogs for sale are Shelter or Rescue dogs which Pet Shops are prohibited from selling for a profit.

83.     Many Class A USDA licensees do not have the logistical or staff capacity to sell directly to Pet Shops.  Some abandoned that route long ago because of the added expense and time required.  Instead, they partner with Class B USDA licensees, either Distributors or Brokers to sell puppies and kittens indirectly to Pet Shops in the City.  Hobby Breeders have even more limited access to Pet Shops in the City, and have relied on Class B USDA licensees, like Hunte,

22

to facilitate sales into the City.  Hobby Breeders breed fewer animals by definition and do not have business operations that could handle the day-to-day marketing, sales and communications needed to sell to Pet Shops directly.

84.     All Pet Shops selling dogs and cats must provide purchasers the right to return the dog or cat within fourteen days if diagnosed by a veterinarian to be unfit for sale because of a contagious disease . . . and obtain another pet, or be reimbursed for the cost of the pet, or at least some of the medical costs.  Stress from surgery will decrease the animal's ability to fight off infectious diseases that normally do not result in illness.  Profits from puppy and kitten sales will diminish based on the increased costs of mandatory surgery, postoperative care, and increased costs of warranties, to the extent that puppy sales will cease to be profitable and Pet Shops will be unable to stay in business.  If no longer in business, Pet Shops will be unable to honor existing warranties.

85.     The Pet Shops will be unable to honor their contracts, including their Shop leases, if the Laws are enforced, because they rely upon sales of puppies for their livelihoods and the Laws essentially ban those sales.  All contractual relationships between these stores and their employees, landlords, tenants, veterinarian, and/or business partners will be severely disrupted by the impact of these Laws.

**B.      <u>The Laws Are Preempted By State Laws Governing The Practice Of Veterinary
Medicine</u>**

86.     Veterinarians have put the City on notice that mandatory sterilization should not be performed on pet store puppies without due consideration and concern for each patient.  If forced to perform such surgeries, any negative outcome could be perceived as animal cruelty.

87.     Sterilizing dogs and cats at any age requires major abdominal surgery and general anesthesia, and requires appropriate pre and post-operative care, and consultation with the owner

who must provide informed consent before the procedure begins.  Sterilization causes an animal

physical injury.  No matter the age of the patient, a Pet Shop is not the appropriate post-operative

environment.  In younger patients, with naive immune systems, the risks of post-operative

infections increases significantly, and even more so if housed in a Pet Shop, which are not bio-

secure environments.

88.     Every surgical procedure includes risks of potential sequellae including

hospitalization and/or surgery.  A veterinarian is unable to provide written assurances that a dog

or cat would not foreseeably have to be hospitalized or undergo surgery in the future, after

sterilizing that animal.  On a case-by-case basis, a veterinarian would be unable to certify that

prepuberal gonadectomy would not result in harm or the need for non-elective procedures or

hospitalization in the future.

89.     Dr. Arnold L. Goldman, a State-licensed veterinarian, and member of the

NYPWA Veterinary Advisory Council stated:

> Finally, § **17-703 (a)(9)(b)** would require a veterinarian to predict the future
> health of an animal based on what is seen only at its most recent examination, by
> stating in writing that the animal *"is not likely to require hospitalization or non-
> elective surgical procedures in the future."* An examination is at best, a snapshot
> in time of an animal's current, immediate health. A veterinarian cannot predict, in
> the case of acquired or sub-clinical illness or condition, whether hospitalization or
> surgery would be required in the future. I urge you to also strike this requirement.

(Emphasis in original).  Attached hereto as **Exhibit 13** is a true and correct copy of Dr.

Goldman's written testimony submitted to the Committee on April 21, 2015.

**i.     Mandatory Sterilization Violates Professional Standards Of Care**

90.     Veterinarians testified at several hearings before the Committee stating that

mandatory sterilization is not in the best interest of their patients and can result in harm and even

death.  Veterinarians use their professional judgment on a case-by-case basis, discuss the merits

and potential harm to their patients with an animal's owner before any procedure, particularly if

24

such procedures were performed on puppies between 8-12 weeks of age in a pet store

environment.

91.     Dr. Linda Jacobson, former President of the New York City Veterinary Medical

Association and the State Veterinary Medical Society ("NYSVMS") explained some of the risks

of and objections to mandatory sterilizations:

> [T]he AVMA and the New York State Veterinary Medical Society . . .do not
> support regulations requiring the spay and neuter of privately owned non-shelter
> dogs and cats . . . These procedures performed on pediatric animals are complex
> and can be at great risk to the animal. For example, the risk of a drop in body
> temperature is greater in a young animal than in an older one. This can lead to
> death. There can be a drop in blood sugar as well, leading to seizures and death.
> Also many pups and kittens are born with congenital heart murmurs that can be
> outgrown over a period of time. To operate on an animal with this condition can
> hasten death, whereas if the pet is allowed time, the procedure would have a more
> successful outcome. Just as for other medical and surgical procedures,
> veterinarians should use their best medical judgment in deciding at what age a
> spay/neuter should be performed on individual animals. Studies done at several
> universities and by breed associations are demonstrating time and again that early
> spay and neutering can increase the risk of many types of cancers such as bone
> cancer and lymphoma as well as increasing the risk of joint diseases, such as hip
> dysplasia and ACL tears. And even more seriously, it can shorten the lives of
> these pets.

Attached hereto as **Exhibit 14** is a true and correct excerpt of the Committee Hearing

Transcript, April 21, 2015; see page 127, line 18 – page 128, line 23.

92.     Dr. Marc Seibert, CVA, a veterinarian who owns two animal hospitals in

Manhattan, explained the surgical risks on such young patients, complicated by the immaturity

of their immune system:

> I would like to address the impending legislation requiring the sterilization of
> dogs and cats sold or adopted from pet stores and shelters. I would like to urge
> you to reconsider this law. As a medical professional, I would like to address the
> possible morbidity and mortality associated with early spay and neuter.
> 1.   There is a death rate associated with early spay and neuter.
> 2.   AAHA standards of medicine cannot be carried out due to size restriction of
> patients being sterilized. This means no IV catheter is placed, no IV fluids are
> given, no resuscitation medications are possible to give as there is no patent vein.

25

3.  Puppies and kittens 8-12 weeks of age is when their immune system is developing. Therefore, if surgery is performed, the development of immunity to environmental diseases such as parvovirus, distemper virus, hepatitis, adenovirus, bordetella, canine flu and many others will be curtailed as the immune system will be stressed with a surgical injury and not mount immune responses to these deadly diseases in dogs and cats.

4.  Multiple breed specific and size specific diseases and syndromes are documented in early spay and neuter.

I believe, a client — patient - veterinarian relationship needs to be formed in order for a new pet owner to make an informed decision about when to spay and neuter their new family member based on breed, size, age and genetics.

Attached hereto as **Exhibit 15** is a true and correct copy of Dr. Siebert's written testimony submitted at the April 21, 2015 Committee hearing.

93.    Dr. Stuart Goldenberg, a veterinarian practicing in the City for 25 years, and a member of the NYPWA Veterinary Advisory Council described the plethora of scientific studies identifying the short and long term risk of sterilizing dogs, concluding that "it is becoming increasingly more evident that early or pediatric spaying of female dogs can adversely affect the health and longevity of these pets."  Attached hereto as **Exhibit 16** is a true and correct copy of Dr. Goldenberg's written testimony submitted at the April 21, 2015 Committee hearing.

94.    Veterinarians also testified that federal and state veterinary associations opposed mandatory sterilization for owned animals, as compared with shelter animals.  Scientific evidence of the long-term sequellae of prepuberal gonadectomy resulting in physical abnormalities, metabolic disorders, increased incidence of certain cancers, and decreased longevity were submitted as testimony.  Attached hereto as **Exhibit 17** are true and correct copies of the following scientific articles submitted as written testimony to the Committee on November 24, 2014: Dawn M. Cooley, et al., Endogenous Gonadal Hormone Exposure and Bone Sarcoma Risk, Cancer Epidemiology, 11 BIOMARKERS & PREVENTION 1434-1440 (2002); B.L. Hart, et al., Long-Term Health Effects of Neutering Dogs: Comparison of Labrador Retrievers with Golden Retrievers, PLOS ONE (JULY 14, 2014)

26

http://journals.plos.org/plosone/article?id=10.1371/journal.pone.0102241; Laura J. Sanborn, Long-Term Health Risks and Benefits Associated with Spay/Neuter in Dogs, May 14, 2007; G.T. de la Riva, et al., Neutering Dogs: Effects on Joint Disorders and Cancers in Golden Retrievers, 8 PLOS ONE 2 (February 2013); D.J. Waters, et al., Exploring Mechanisms of Sex Differences in Longevity: Lifetime Ovary Exposure and Exceptional Longevity in Dogs, 8 AGING CELL (2009);.Chris Zink, Early Spay-Neuter Considerations for the Canine Athlete: One Veterinarian's Opinion, CANINE SPORTS PRODUCTIONS (2013) www.caninesports.com.

95.     Veterinary associations, including the American Veterinary Medical Association ("AVMA"), the Society for Theriogenology ("SFT"), and the American College of Veterinary Theriogenologists ("ACT") object to laws requiring mandatory sterilization at any age for privately-owned pets, including those purchased from Pet Shops.

96.     The AVMA, established in 1863, is a not-for-profit association representing more than 86,500 veterinarians working in private and corporate practice, government, industry, academia, and uniformed services.  Structured to work for its members, the AVMA acts as a collective voice for its membership and for the profession.  "The AVMA does not support regulations or legislation mandating spay/neuter of privately owned, non-shelter dogs and cats." The AVMA identified the following conditions were associated with prepuberal gonadectomy: "increased risk of prostatic cancer in males; increased risks of bone cancer and hip dysplasia in large-breed dogs . . . and increased incidences of obesity, diabetes, urinary tract infections, urinary incontinence, and hypothyroidism."  Attached hereto as **Exhibit 18** is a true and correct copy of the AVMA's position statement on mandatory spay/neuter submitted as written testimony to the Committee on November 24, 2014.  Attached hereto as **Exhibit 19** is AVMA's news release titled, AVMA: Mandatory spay/neuter a bad idea, dated May 15, 2009, submitted to

27

the Committee as written testimony on November 24, 2014.  Attached hereto as **Exhibit 20** is

AVMA's position statement on mandatory spay/neuter downloaded from

www.avma.org/News/JAVMANews/Pages/090515j.aspx.

97.     The SFT is an organization of veterinarians dedicated to animal reproduction,

whose mission is to promote standards of excellence in reproductive medicine, to provide

outreach and education to veterinarians, and to foster continual improvements in theriogenology.

The ACT is a veterinary specialty organization, recognized by the American Veterinary Medical

Association, as the organization certifying veterinarians as specialists in Theriogenology

(veterinary reproduction).  The SFT/ACT identified thirteen health benefits to keeping a dog or

cat intact, including a decreased incidence of hemangiosarcoma, osteosarcoma, transitional cell

carcinoma, prostatic adenocarcinoma, obesity, urinary incontinence, canine and feline urinary

tract infection, autoimmune thyroiditis and hypothyroidism, canine and feline diabetes mellitus,

cranial cruciate rupture, hip dysplasia, and capital physeal fractures.  While there are also some

health benefits associated with sterilization, the SFT/ACT strongly suggests a discussion

between a veterinarian and each pet owner should precede gonadectomy so that the pet owner

can make an informed decision about if and when this elective procedure should be performed.

Attached hereto as **Exhibit 21** is a true and correct copy of the SFT/ACT joint position statement

on mandatory spay/neuter submitted as written testimony to the Committee on April 30, 2014.

Attached hereto as **Exhibit 22** is a true and correct copy of the SFT/ACT joint position statement

on mandatory spay/neuter submitted as written testimony to the Committee on November 24,

2014.

98.     "[T]he decision to spay or neuter a pet must be made on a case by case basis,

taking into consideration the pet's age, breed, sex, intended use, household environment and

28

temperament.  The use of generalized rules concerning gonadectomy (removal of the ovaries or testes) is not in the best interest of the health or well-being of the pets or their owners." *See* Ex. Nos. 21, 22.

99.   The AKC sent a letter to Speaker Mark-Viverito and Members of the New York City Council, dated April 27, 2015, copied to NYPWA, stating:

> The American Kennel Club joins a broad range of other animal advocates including the American Veterinary Medical Association, No-Kill Advocacy Center, the American College of Theriogenologists, and the National Animal Interest Alliance in opposing the concept of government-mandated spay/neuter. These position statements are included as Addendum 1 to this letter.
>
> Harmful impacts of juvenile sterilization: Surgical spaying and neutering are major, elective surgeries. *Increasing scientific evidence demonstrates that radical castration and ovariohysterectomy —particularly when conducted on puppies as young as 8 weeks of age—as would be required by the new NYC law—are harmful to the long-term health of a dog.*
>
> Potential harm related to juvenile spay/neuter includes elevated risks associated with neonatal anesthetization and recovery, as well as an increased potential for cancer, hip dysplasia, ligament damage, a shorter lifespan, and even chronic incontinence – which creates housetraining issues, one of the more common reasons dogs are surrendered to shelters.
>
> Although spay/neuter is properly considered an elective surgery, it is a major surgery with potentially serious consequences. ***The decision to spay or neuter a dog is one that should be made by the pet's owner after careful discussion with their veterinarian***.

(Emphasis in original).  Attached hereto as **<u>Exhibit 23</u>** is a true and correct copy of the letter sent by AKC to Speaker Mark-Viverito and Members of the New York City Council, copied to NYPWA, dated April 27, 2015.

**ii.     Pet Shop Environment Presents Known Surgical Risks**

100.   A Pet Shop is not an appropriate environment for pre and post-operative care for mandatory sterilization of dogs and cats, particularly if the procedure is required at 8-12 weeks of age, when most puppies are sold.  At this age, the immune system of the animal is still

developing responding to vaccinations which are recommended at specific times for preventive care.

101.   "Very young puppies do not have fully developed immune systems and are highly susceptible to infectious diseases. To keep [a] . . . puppy healthy and to provide optimal protection against disease for the first few months of life, a series of vaccinations are scheduled, usually 3-4 weeks apart. For most puppies, the final vaccination in the series is administered after twenty weeks of age."  Requiring invasive, unnecessary, elective surgery at this time will compromise the continued development of the animal' immune system and expose the animal to increased risk of infectious diseases which they would otherwise have been able to combat. Attached hereto as **Exhibit 24** is a true and correct copy of Dr. Frances O. Smith's webpage downloaded from http://smithveterinaryhospital.com/dog-vaccinations-minneapolis/dog-care-minneapolis.php.

102.   In addition, surgical patients who have had general anesthesia, requiring special post-operative care and attention cannot be properly rehabilitated in a pet store environment. Post-operative care of pets undergoing surgery includes: minimizing physical activity to avoid incision trauma, which often requires keeping pets away from other animals and for the youngest animals, closely monitoring hydration, temperature, and other indicators of health.  Veterinarians have refused to perform such procedures in puppies kept in Pet Shops, before sale to the owners, for all of these reasons.

## VII. <u>THE LAWS VIOLATE THE DUE PROCESS CLAUSE</u>

103.   Plaintiff repeats and realleges the foregoing allegations as if more fully set forth at length herein.

104.   Class A and B USDA licensees have a property interest in their federally-granted license.

105.    Defendants have alleged that Class B USDA licensees, as a whole, are the evil middlemen of the pet industry who conceal the source of their animals.

106.    No NYPWA-Class B USDA licensee has received a citation for failure to comply with the record keeping requirements of the AWA and related regulations.  7 U.S.C. § 2140, 9 CFR § § 2.75-2.80.

107.    USDA has not terminated, on a temporary or permanent basis, NYPWA-members Class A or B USDA licenses.

108.    Class A and B USDA licensees have not received notice from USDA or attended hearing as required before their license is terminated or revoked.  7 U.S.C. § 2149.

### VIII.  <u>THE LAWS VIOLATE THE EQUAL PROTECTION CLAUSE BY SELECTIVELY DISCRIMINATING AGAINST PLAINTIFF</u>

109.    Plaintiff repeats and realleges the foregoing allegations as if more fully set forth at length herein.

110.    The laws heavily favor Shelter and Rescue organizations, including the ARO's Defendants colluded with, and were intended to convince the public that Pet Shops are evil, sell sickly, deformed animals, and that pet owners should "adopt" from Shelters and Rescues instead of "shopping" at Pet Shops.  The intended effect of these laws was to make it "more difficult to acquire [dogs and cats] through pet shops, or more expensive to acquire puppies or kittens from breeders.  We hope that, overall, the expanded regulation of pet shops will encourage New Yorkers to adopt from shelters run by Animal Care and Control."  Attached hereto as **<u>Exhibit 25</u>** is a true and correct copy of the written testimony of Daniel Kass, MSPH, DEH Deputy Commissioner, submitted to the Committee on April 30, 2014.

111.    Pet Shops will be unable to compete for the sale of dogs and cats with Shelters, Rescues, and City-exempt breeders who are not affected by these Laws.  City-exempt breeders

31

can sell puppies directly to consumers, but Pet Shops cannot purchase from any Hobby Breeders no matter where they are located and are not subject to the same draconian sterilization mandates facing Pet Shops.  Shelters and Rescues can continue to purchase/obtain dogs from any source including those banned for Pet Shops.  Local Law 7 requires mandatory sterilization of dogs and cats at least eight weeks of age and weighing at least two pounds before they can be sold from Pet Shops without exception, but a Pet Shop that allows an animal shelter or non-profit rescue group to the shop's [p]remises for the purpose of making animals available for adoption shall be exempt from the [mandatory sterilization] requirements . . . provided such pet shop does not have an ownership interest in any of the animals that are made available for adoption."  Local Law 7 § 17-804 (f).

112.    The Shelters and Rescues are not prevented from making a profit on the same animals and have become huge profit centers.  The Shelters and Rescues supporting these amendments stand to gain considerable additional economic benefits from the Laws.  For example:

- o   In Fiscal Year 2013 Companion Animal Protection Society ("CAPS") reported: total revenues of $671,763; a profit of $109,065; and contributions totaling $629,322.
- o   In Fiscal Year 2013, Friend of Animals ("FoA") reported: total revenues of $4,912,624; a profit of $25,824; contributions of $2,849,615; compensation to current officers, directors, trustees and key employees of $330,295, and payments of $561,707 for other salaries and wages.
- o   In Fiscal Year 2013, Humane Society of the United States ("HSUS") reported: total revenues of $132,773,775; a profit of $12,556,311; compensation to officers, directors and key employees to the tune of $2,822,670, including $356,305 to President and CEO Wayne Pacelle; and payment of $33,444,909 in other salaries and wages.
- o   In Fiscal Year 2013, 203.  American Society for Prevention of Cruelty to Animals ("ASPCA") reported: total revenues of $171,665,749; compensation to officers, directors and key employee to the tune of $4,386,260; payment of $47,499,116 in other salaries and wages; payment of $2,092,591 for professional fundraising services; and payment of $25,169,850 for advertising and promotion.

Attached hereto as **Exhibit 26** are true and correct copies of: pages 1-12 of CAPS's IRS Form 990-2013; pages 1-12 of FoA's IRS Form 990-2013; pages 1-14 from HSUS's IRS Form 990-2013; and pages 1-15 from ASPCA's IRS Form 990-2013.

113.    Upon information and belief, Rosenthal relied on ARO's to help draft the State law, and intentionally excluded USDA licensees, Hobby Breeders, Pet Shops and USDA officials from this process.

114.    Senator Mark J. Grisanti, sponsor of the Senate version of Rosenthal's bill, issued the following statement after the bill passed:

> I also want to thank all of the animal rights advocates and anyone else who called or e-mailed or shared information with me about how to better regulate animal breeders and pet store owners. Their experience and expertise helped us draft this legislation.

Attached hereto as **Exhibit 27** is a true and correct copy of the January 9, 2014 press release downloaded from https://www.governor.ny.gov/news/governor-cuomo-signs-legislation-strengthen-oversight-pet-dealers-new-york-state.

115.    ASPCA admitted that the State law "was supported by an ASPCA-led coalition of municipal, legal and animal welfare organizations and also by City Council resolution, so we are incredibly grateful for the leadership of Council Member Crowley and Chairman Johnson for making good on that support by putting Intro. 55 forward."  Attached hereto as **Exhibit 28** is a true and correct copy of the written testimony submitted by ASPCA to the Committee on April 30, 2014, *see* page 2.

**A.    Rescues And Shelters Are Similarly Situated To And Compete With Pet Shops**

116.    Rescues, Shelters and Pet Shops transfer the ownership of cats and dogs to consumers for payment, and are therefore similarly situated.  The transfer of ownership from Pet

Shops is referred to as a "sale." The transfer of ownership from Shelters and Rescues is referred to as an "adoption" or "rescue."

117.    AC&C is a non-profit corporation that operates the City's municipal animal shelter system under a five-year, $51.9 million contract with the DOHMH. As reported in the Audit Report on Animal Care and Control of New York City, Inc.'s Financial and Operating Practices, the City Comptroller confirms that: "AC&C reported total revenue of $13.7 million and total expenses of approximately $13.3 million" in Fiscal Year 2013, leaving them with profits of $400,000. AC&C is to receive more than $8,000,000 dollars this year to build a new adoption center and renovate its Brooklyn shelter. Attached hereto as **Exhibit 29** is a true and correct copy of the Audit Report on Animal Care and Control of New York City, Inc.'s Financial and Operating Practices, dated April 17, 2015, downloaded from http://comptroller.nyc.gov; and a true and correct copy of Animal Care and Control of NYC plans new adoption center in Manhattan, The New York Daily News downloaded from http://m.nydailynews.com/new-york/ac-plans-new-animal-adoption-center-article-1.2088878  (Jan. 22, 2015, 8:18 PM).

118.    According to its webpage, the Mayor's Alliance for NYC's Animals ("Alliance") is a 501(c)(3) non-profit charity, which, since 2003 has been working with a coalition of more than 150 rescue groups ("Rescues") and shelters ("Shelters"), that transfers animals from the City's Shelters to more than 140 partner Rescues in a program called the New Hope Transfer Program. Alliance President "Hoffman said she thinks of the Transfer Program as a giant distribution network with AC&C as the 'wholesaler' and the partner organizations as 'retailers' who get the animals face-to-face with the public." In Fiscal Year 2013, the Alliance reported: total revenues of $5,558,542; adoption subsidies of $2,905,804; gifts, grants, contributions and memberships fees of $7,347,233; compensation to current officers, directors, trustees and key

34

employees of $148,653, and payment of $431,187 for other salaries and wages.  Attached hereto as **Exhibit 30** is a true and correct copy of the Mayor's Alliance for NYC's Animals: New Hope Transfer Program, compiled by the ASPCA and downloaded from http://www.aspcapro.org/sites/default/files/mayors-alliance-for-nyc-animals-profile_0.pdf. Attached hereto as **Exhibit 31** is a true and correct copy of pages 1-11 of the Alliance's Internal Revenue Service ("IRS") Form 990-2013.

119.    The Alliance transports animals throughout the City for adoption in at least three customized vehicles.  "Recognizing that most people in NYC do not drive – and certainly don't have trucks to transport animals, the Alliance operates a transport program to facilitate the movement of animals."  *Id*.

120.    This coordinated system between Shelter and Rescues directly competes with Pet Shops in the City.

121.    Risa Weinstock, AC&C, said that "[p]ure bred dogs and breeders just are adding animals to the--it's sort of our competition for adoptions. There are people who go to breeders instead of adopting animals, and as I said, the statistics show that there's never a shortage of animals available for adoption."  Attached hereto as **Exhibit 32** is a true and correct copy of the written testimony submitted by Weinstock on behalf of AC&C to the Committee on April 30, 2014.

> Upon information and belief, the Humane Society of New York ("HSNY") runs a veterinary clinic and adoption center in the City.  In Fiscal Year 2012, HSNY reported: total revenues of $6,072,820; a profit of $850,005; fees from the adoption center of $53,945; contributions totaling $3,003,930; and compensation to employees' salaries over $1,000,000.

Attached hereto as **Exhibit 33** is a true and correct copy of pages 1-12 of HSNY's IRS Form 990-2012.

35

**B.** **Retail Rescues Are The New Pet Shops**

122.    Rescues have replaced pet stores in many jurisdictions and have become the "new

era 'pet shop.'

> '[R]escues in the northeast started importing dogs from the southeast, Puerto
> Rico, Mexico and even Russia! Why? . . . The answer is: money! I once said that
> if there was money to be made in animal welfare, there'd be a shelter on every
> corner. Well now there is.
>
> . . .
>
> It is widely believed that these dogs are being intentionally bred at puppy mills
> and then brought to the northeast . . .
>
> . . .
>
> The term is called 'flipping' puppies. Often these puppies are ill and carry
> contagious diseases, many of which show no symptoms until the dog is in your
> home and they have your money. On March, the New York state [sic] Attorney
> General's Office arrest two people that were flipping puppies in Long Island . . .
> These people were running a rescue!
>
> . . .
>
> In fact, you are actually better off buying a puppy from a pet shop than adopting
> one from these so-called 'rescues.'
>
> . . .
>
> The ASCPA estimated there are now 20,000 dog rescues. Facebook alone has
> 13,000 . . . many local shelters are also participating in the dog transport because
> they too can cash in on puppy flipping-or should I say 'puppy gouging'-because
> these puppies can demand a higher than standard adoption fee because of their
> adoptability.

Attached hereto as **Exhibit 34** is a true and correct copy of Ron Perez and Charlene

Marchand, The new age pet shop, Register-Star (May 10, 2015 12:00 am) downloaded

from http://www.registerstar.com/columnists/soft_paws/article_7320794a-f2a7-11e4-

b4b1-d325b2f7b20a.html.

123.    The supply of shelter dogs is dwindling, particularly in the North Eastern United

State, and Shelters and Class A USDA Breeders compete for the same market share.

Dog transports have become big business, with dogs being moved from areas where they are not getting adopted to areas where they go out the door quickly. Generally speaking, New England and parts of the northeast, upper midwest, and Pacific northwest now have shortages of shelter dogs.

. . .

[Shelters should] find some way to co-opt the industry – to make sure there is a big enough supply of shelter dogs for community No Kill shelters to be able to maximize their market share. The most obvious way to do this would be to start importing homeless dogs from overseas.

. . .

Another way to tackle the problem would be for volunteers to breed litters which would then be donated to their local shelter for placement.

Attached hereto as **Exhibit 35** is a true and correct copy of The Coming Shelter Dog

Shortage, OUT THE FRONT DOOR (January 5, 2015, 8:12 am)

http://outthefrontdoor.com/2015/01/05/the-coming-shelter-dog-shortage/.

124.    Animal health officials in the North East, where thousands of imported rescues

are sent, have changed state laws that acknowledge the existence of Retail Rescues and the threat

to the state's animals from the generally unregulated importation of these animals.  R.I. Admin.

Code 25-3-27:8.00 (2015); N.H.S.A. § 437:10 (V) (2015); C.G.S.A. § 22-344 (2015).

125.    In 2015 during a 45-day time period there were at least 2000 interstate veterinary

health certificates identifying dogs and cats imported to Shelters and Rescues in the State from

throughout the country (excluding Hawaii and Alaska).

126.    Upon information and belief, the Shelters and Rescues make a profit selling dogs

and cats in the City.  The North Shore Animal League ("NSAL") sells dogs and cats throughout

the City which they regularly obtain from substandard breeders throughout the country.

According to its website, they "reach across the country to rescue animals from overcrowded

shelters, unwanted litters, puppy mills, natural disasters and other emergencies and find them

37

permanent, loving homes."  Adoption fees range from $50-225 dollars.  NSAL also lists the number of pets it rescued from around the country on its website.  Upon information and belief, NSAL rescued at least 3,562 pets from 13 states and Puerto Rico between December, 2010 until December, 2014.  In Fiscal Year 2013, NSAL reported: total revenues of $35,655,064, with $1,524,982 for its Pet Rescue and Adoption; compensation of current officers, directors and key employees totaling $1,611,478; and payment of other salaries and wages totaling $10,210,036.  *See* Ex. 11; Attached hereto as **Exhibit 36** are true and correct copies of pages 1-12 from NSAL's IRS Form 990-2013.

### C.   Defendants Violate The Equal Protection Clause By Maliciously Targeting Plaintiff To Cause Harm

127.    Law-abiding USDA Class A and B licensees and those dog breeders determined to be exempt from licensing have been intentionally labeled "puppy mills" by animal rights activists' intent on their demise.  Pet Shops, accused of selling puppy mill dogs, have been equally and maliciously maligned.

128.    During the April 21, 2015 hearing, many members of the NYPWA testified about the animus they felt from Defendants, and the fact that the Laws were intentionally written to put Pet Shops and their sources out of business.

129.    Michael Gill, a Pennsylvania pet store owner, who testified at the hearing on November 24, 2014 before the City Council Committee on Health made defamatory statements against Hunte Corporation.  At the April 2015 hearing, Mike Stolkey, defending the Hunte Corporation against Gill's defamatory statements, stated "The fact that HSUS got this Council to ban Class B breeder's distributors makes you complicit with the defamatory statements from Gill and others previously made in these hearings."  *See* Ex. 14, at 53:18-22.

130.     Keith Dalessio, a third generation pet shop owner testified "I feel like my livelihood is a target of an egregious attack, an . . . attack rooted in animosity, hostility and disdain,  It is no secret that the Council Members Ms. Crowley and Ms. [sic] Johnson have an agenda . . .[to put] Pet Shops out of business.  Their ill will towards Pet Shops is clear from listening, reading, and watching hours of their testimony about these bills." *Id*., at 102:16 – 103:3.

131.     Dr. Weinstein, a veterinarian and member of the NYPWA said "if the Council just hates pet stores and they want to put them out of business, then they should just propose a law that pet stores are illegal." *Id*., at 105:12-15.

132.     David Jacoby of Citipups testified: "And it's like you guys are just . . . out to do the pet stores in . . . I just believe it's a direct attack on pet stores to put us out of business.  And it's just not right what you guys are doing, and I really believe that you know what you're doing and it's not right." *Id*., at 108:24-109:13.

133.     Gary Nudelman, a pet store owner for 30 years said: "I'm appalled and embarrassed by the City Council who have no real interest in animal welfare . . . you the Council are forcing us to do something we would never dream of, and that is put a puppy . . .[in] harm's way.  You are telling us we cannot do business with smaller breeders that we have been doing business with for decades, because they only breed a few puppies or maybe just one litter.  The law as it stands is doing harm to relationships I have with my customers." *Id*., at 112:5-115:4.

134.     Defendants' repeated and false statements that Pet Shops sell puppy mill animals will escalate relentless attacks on Pet Shops, unless the Laws are enjoined.  Citipups, a Pet Shop in the City, has been besieged by protesters outside the shop since September 2010, falsely accusing them of purchasing puppies from puppy mills, based on an alleged investigation by

39

HSUS.  In an online petition at https://www.causes.com/actions/1668047-tell-citipups-to-stop-selling-puppies, activists called for the shop to stop selling puppies entirely.  The petition also calls on City officials to adopt an ordinance banning such sales, which they have now done.  Attached hereto as **Exhibit 37** is a true and correct copy of the webpage with the online petition.

135.    Even worse, Citipups' long-time manager, David Jacoby, was physically attacked by a protester outside Citipups on December 9, 2010, who was arrested by the New York City Police and charged with assault.  An Order of Protection was issued by the New York Supreme Court on February 16, 2011.  A lawsuit against the violator and other harassing activists, filed on October 16, 2013, is still pending.  Attached hereto as **Exhibit 38** are true and correct copies of the pleadings.

136.    Citipups does not purchase puppies from substandard breeders, but was forced to start a website to defend itself against the defamatory, false statements and accusations from protesters, explaining:

> The so called "protesters" claim that EVERY pet shop is a puppy mill, making clear to anyone that they don't understand the cause they are defending! Citipups does NOT support substandard breeding facilities and in fact partners with some of the best breeders in the country. The PROPAGANDA PICTURES the "protesters" show in front of our store are NOT from any of our facilities, they are pulled from the internet... THEY ARE MISLEADING YOU AND ARE LYING TO YOU. See for yourself... stop by one of our locations and check us out.

Attached hereto as **Exhibit 39** is a true and correct copy of the website Citipups was forced to start downloaded from www.citipupsisnotapuppymill.com/.

137.    Upon information and belief, no USDA Class A or Class B USDA licensees were contacted to advise them of the proposed ordinances, or invite them to the hearings, even though Hunte was repeatedly disparaged at the hearing in November 2014 and the Committee knew that these licensees were out of State and would have no idea that the City intended to do them harm.

40

Hunte learned about the Committee Hearing on November 23, 2014, but did not have enough time to attend.

138.    Mike Stolkey, Director of Corporate Sales for Hunte, Michael Glass, a Hobby Breeder and the National Field Representative of America's Pet Registry, Inc., and Bob Likens, from Pet Industry Joint Advisory Council met with Jeffrey H. Campagna, Legislative Counsel to the Council, Serena Longley, Associate General Counsel to the Council, and Mark Muschenheim, City Law Dept., on December 10, 2014 and provided copious documentation about the invidious conduct of ARO's and their national campaigns to eliminate commercial dog and cat breeding and specifically and maliciously targeting Hunte.

139.    No Council member contacted any pet store in their district to inform them of the proposed ordinances, including Johnson, who lives steps from a Pet Shop and walks by it daily. Johnson admitted that he entered the pet store, without informing the owner or manager, and failed to inquire about the business or the effects these laws might have.

140.    Glass testified at all three hearings on the "pet store laws" the City approved.  On April 21, 2015, he submitted written testimony to the Committee, expressing his disappointment with the Committee's failure to amend the Laws, particularly the mandatory sterilization requirement in Local Law 7 and Pet Shop sourcing prohibitions in Local Law 5.  He also submitted the specific amendments to the Laws counsel to NYPWA had provided counsel to Defendants.  Attached hereto as **Exhibit 40** is a true and correct copy of Glass's written testimony submitted to the Committee on April 21, 2015.

141.    NYPWA, through its counsel, sent letters to the City, Council and Defendants Johnson and Crowley before the Laws were adopted, and met with counsel to the City and Council to discuss their concerns and the impact the Laws would have on its members.  Counsel

for both parties continued to correspond until mid-to-late April, when some NYPWA-recommended amendments were adopted by Council.  The final version of the Law was signed into law by the Mayor on June 2, 2015.

142.     NYPWA President Cynthia Daluise emailed Johnson to discuss the NYPWA's concerns about the irreparable harm the Laws will have.  "I am following up with you regarding my request to discuss the pet shop laws which will come into effect on June 1, 2015.  Since time is of the essence I would ask to meet with you as soon as possible.  Please let me know where and when you would like to meet.  Thank you for listening and agreeing to meet with me."  Daluise is still waiting for Johnson's response.  Attached hereto as **Exhibit 41** is a true and correct copy of the email Daluise sent Johnson on April 22, 2015.

143.     Seventeen NYPWA-members emailed and/or faxed a letter to the Council on April 23, 2015 describing concerns about the Laws and the impact they will have on NYPWA-members.  Attached hereto as **Exhibit 42** is a true and correct copy of the letter sent to Council.

144.     These comments were ignored.  Instead, Defendants relied on ARO's decades-long campaigns against commercial dog breeders, and their unsubstantiated, unreliable "alleged" evidence to help draft, lobby for, and adopt the State and City laws.  The attacks on pet stores and their sources throughout the country, led by CAPS, ASPCA, and HSUS and others have put pet stores in other jurisdictions out of business.  The malicious, venomous attacks on NYPWA-members will irreparably harm their reputation and good will.  ARO's, including, for example, ASPCA and HSUS spend millions of dollars campaigning against their very existence.  *See* Ex. Nos. 26, 33 and 36.

### IX. THE LAWS VIOLATE THE COMMERCE CLAUSE

145.     Plaintiff repeats and realleges the foregoing allegations as if more fully set forth at length herein.

A.     **The Laws Violate The Commerce Clause By Barring Entry To City Markets And Placing A Burden On Interstate Commerce**

146.    Local Law 5 bans entry to City pet markets from Class B USDA licensees and thereby places an undue burden on interstate commerce.  Loss of access to the City markets represents a significant loss to Class B USDA licensees.

147.    Many Class A USDA licensees and Hobby Breeders around the country only have access to the City pet market through Class B USDA licensees, whom they partner with to provide healthy puppies to consumers in the City who want to buy their puppies.  The logistics and cost of accessing the City market directly is beyond the reach and capacity of these breeders. Without continued access through Class B USDA licensees these Breeders and Hobby Breeders will go out of business.

B.     **The Laws Violate The Commerce Clause By Targeting Out-Of-State "Puppy Mills"**

148.    Crowley, Johnson and Rosenthal intentionally introduced laws to legislate conduct outside the City and State.  A Council report specified that "[m]ost of the puppies sold in New York City pet stores come from puppy mills in the Midwest."  *See* Ex. 27.

149.    Crowley said "[f]or many years now I have been working with the Council and representatives in Albany to stop the sale of puppy mill dogs in New York City."  *See* Ex. 12, at 11:13-12:4.

150.    Johnson admitted that the laws were intended to address out-of-state, national concerns.  "Taken together, these bills will enable the city to . . . join the nationwide effort to keep bad actors out of the pet supply chain."  *See* Ex. 12, at 10:13-18.

151.    Upon information and belief, these Defendants and ARO's consider any commercial dog breeder to be a "puppy mill," and each has a national campaign to ban the sales

43

of puppies from Pet Shops.  Rosenthal and Defendants Crowley and Johnson admitted they

worked with these ARO's to draft and adopt the Laws.

152.    Upon information and belief, CAPS is a self-anointed national authority on the

pet shop and puppy mill industry.  CAPS has a Pet Shop Campaigns Overview webpage on

which it describes integrated tactics used for "a pet shop campaign model for cities and towns

around the country" including: Investigations of Pet Shops, Consumer Complaints, Puppy Mill

Investigations, Pet Shop Protests, and Humane Store Conversion.  According to its website,

CAPS "goal is not to shut down Pet Shops, although sometimes that is the outcome.  [CAPS]

want[s] to convert Pet Shops to humane adoption centers that provide animals from local rescues

and shelters."  Attached hereto as **Exhibit 43** is a true and correct copy of CAPS Pet Shop

Campaigns Overview webpage, www.caps-web.org/pet-shop-campaigns.

153.    John T. Maher, CAPS, maligned all Class B USDA licensees at the April 30,

2014 Committee Hearing stating, "CAPS believes that all breeders who are registered with the

USDA under a Class B license, or meet such requirements, are puppy mills and are inhumane."

Conflating "puppy mills" with "commercial dog and cat breeding facilities" Maher testified that

animals born and raised in . . .[commercial dog and cat breeding] facilities are more likely to

have genetic disorders, communicable diseases, some that can lead to death, and lack adequate

socialization, while breeding animals utilized there are subject to inhumane housing conditions

and are indiscriminately disposed of when they reach the end of their profitable breeding cycle.

Attached hereto as **Exhibit 44** is a true and correct copy of the written testimony submitted by

Maher on behalf of CAPS to the Committee on April 30, 2014.

154.    FoA is a non-profit animal advocacy organization with a Puppy Mill Campaign

consultant, Carole Davis, who was also the West Coast Director of the CAPS on April, 30, 2014,

according to FoA's Campaigns Director, Edita Birnkrant.  Birnkrant said the objective of the

City laws are to "end the supply of dogs and cats from breeding facilities, regardless of the

number of animals they are selling and whether or not they are classified as dog or cat 'mills.'"

Birnkrant described the impact these laws will have by stopping the importation of dogs and cats

into the City for sale from entities outside of this jurisdiction.

> New York City is the largest market for pet-factory animals in the country. Being
> the largest market means that stopping the flow of dogs and cats from breeding
> facilities to New York City will impact the flow across the country and have an
> enormous effect.

Attached hereto as **Exhibit 45** is a true and correct copy of the written testimony of Edita

Birnkrant, as submitted to the Committee on April 30, 2014.

155.    Birnkrant said "that this law has not been unduly punitive to Pet Shops in the

cities it has become law."  *Id*.  Birnkrant is wrong.  No other law mandates sterilization of dogs

and cats before sale, without exception.  Pet stores have closed in other jurisdictions after

ordinances were passed which prohibited them from making a profit from the sale of dogs and

cats.  The Pet Shops are all small family run businesses in which profit is generated, in large part,

from the sales of puppies.  Pet Shops cannot compete with large box stores selling pet supplies,

often over the internet.

156.    HSUS, with a decades-long campaign to ban breeding of purebred dogs, accused

"[m]ore than 100 pet stores in New York" of purchasing puppies from puppy mills merely

because they "purchased more than 4,500 puppies from . . . commercial large-scale breeding or

brokering operations in Arkansas, Iowa, Kansas, Minnesota and Oklahoma . . . [and] [m]ore than

3,000 puppies were shipped to New York stores from Missouri alone during that period . . .

[claiming that] Missouri is the puppy mill capital of America."  HSUS performs unofficial

investigations of alleged "puppy mills" which it uses to malign Pet Shops and their sources.

45

Upon information and belief, HSUS has drafted and/or supported ordinances in many jurisdictions to put Pet Shops and their sources out of business.  HSUS published "A Guide to Using Local Ordinances to Combat Puppy Mills" on its website.  Attached hereto as **Exhibit 46** is a true and correct copy of "A Guide to Using Local Ordinances to Combat Puppy Mills" downloaded from http://www.humanesociety.org/assets/pdfs/pets/puppy_mills/ordinance_guide.pdf.  Attached hereto as **Exhibit 47** is a true and correct copy of the written testimony submitted by HSUS to the Committee on April 30, 2014.

157.    Cori Menkin, Senior Director for the Puppy Mills Campaign for the ASPCA, stated: "[a]s part of my role at the ASPCA, I oversee our No Pet Store Puppies campaign, which urges consumers to ***take a pledge not to buy anything in pet stores*** or on websites that sell puppies.  The ASPCA believes that most pet store puppies come from puppy mills, and so we urge the public not to financially support pet stores that hold up the cruel puppy mill industry." (emphasis added)  Attached hereto as **Exhibit 48** is a true and correct copy of ASPCA's nopetstorepuppies webpage, http://nopetshoppuppies.com/puppymill-mills-are-cruel.  Attached hereto as **Exhibit 49** is a true and correct copy of the written testimony of Cori Menkin, testifying before the Committee on April 30, 2014**.**

158.    Zelda Penzel, League of Humane Voters of NY, said that her support of the state law allowing for "home rule" was to ban the sale of all animals from all commercial breeders since none have been raised and maintained in a healthy and safe manner.  Attached hereto as **Exhibit 50** is a true and correct copy of the written testimony of Zelda Penzel, testifying before the Committee on April 30, 2014.

159.   Jane Hoffman made defamatory and disparaging comments about Hunte and other

Class B USDA licensees:

> concealing the source of animals from NYC consumers and pet stores and
> regulator . . . consistently buying from substandard and inhumane breeders . . .
> obtain[ing] their animals from large scale, commercial breeders . . . commonly
> known as puppy mills . . .whose primary goal is profit, not animal welfare . . . .
> Therefore, in the opinion of many animal welfare organizations the sale of
> animals obtained from the Hunte Corporation and brokers like them should be
> prohibited outright . . . The Hunte Corporation ships an estimated 70,000 puppies
> in interstate commerce annually. They have an extensive history of buying
> puppies from breeders who fail to meet even the most basic federal
> requirements."

Attached hereto as **Exhibit 51** is a true and correct copy of the written testimony

submitted by Hoffman to the Committee on April 30, 2014.

**C.   The Laws Are Under-Inclusive Because Animals From Random Sources Pose A Higher Risk Of Infection And Congenital Disorders Than Pets From Pet Shops**

160.   Johnson said the Laws would address the sale of dogs and cats with serious

behavioral problems and costly medical conditions to customers who are deceived by false

claims that a pet store does not deal with puppy mill animals.  Attached hereto as **Exhibit 52** is a

true and correct copy of the Committee Hearing Transcript, April 30, 2014; *see* page 6, line 21 to

page 7, line 14.

161.   The Laws are under-inclusive because they fail to regulate the importation of dogs

and cats from substandard facilities where the animals are at the greatest risk of exposure to

contagious, infectious diseases, and the development of serious behavioral problems resulting

from their substandard care.

162.   Shelters and Rescues obtain dogs and cats from across the country, often with

diseases, e.g., heartworm disease—a condition not seen in pet store animals, and congenital

abnormalities, which consumers are not prepared to nor can afford to manage.  Many of these

animals end up back in the shelter system, compounding, not ameliorating, the alleged

overpopulation of animals in the system.

163.     Both USDA and the Centers for Disease Control have issued warnings and

increased standards to prevent the spread of diseases from puppies bred in substandard

conditions in other countries and imported into the United States for sale.

> The Food, Conservation, and Energy Act of 2008 (Pub. L. 110-246, signed into
> law on June 18, 2008) added a new section 18 to the Animal Welfare Act (7
> U.S.C. 2148) to restrict the importation of certain live dogs. As amended, the
> AWA now prohibits the importation of dogs into the United States for resale
> purposes, unless the Secretary determines that the dogs are in good health, have
> received all necessary vaccinations, and are at least 6 months of age. Section 18 of
> the AWA includes a scoping definition for the term "resale." When read in
> context of the requirements of that section, the term "resale" includes, but is not
> limited to, any transfer of ownership or control of imported dogs to another
> person, for more than *de minimis* consideration.

76 FR 54392.  Rabies, a nearly 100% fatal disease, has been traced back to puppies

adopted through out-of-state rescue organizations, and importation from overseas.  In

November 2013, more than 15 people in Vermont were exposed to rabies from an

infected puppy born in Georgia, which they adopted through an out-of-state rescue

organization.  Attached hereto as **Exhibit 53** are true and correct copies of: NYC DOH

2014 Veterinary Alert #2, dated May 29, 2014 with CDC Health Alert, dated May 27,

2014 (alerting animal health officials that dogs were being imported with fraudulent

paperwork, including rabies vaccination, and that the potential for exposure to rabies was

increased); News Release, RI Department of Environmental Management, November 8,

2013; and J.H. McQuiston, et al., Importation of dogs into the United States: risks from

rabies and other zoonotic animals, Zoonoses and Public Health (received for publication

October 30, 2007 doi: 10.1111/j.1863-2378.2008.01117.x).

164.    Rescues like the North Shore Animal League ("NSAL") sell dogs and cats throughout the City which they regularly obtain from substandard breeders throughout the country.  "Through our many innovative programs, we reach across the country to rescue animals from overcrowded shelters, unwanted litters, puppy mills, natural disasters and other emergencies and find them permanent, loving homes."  Attached hereto as **Exhibit 54** is a true and correct copy of NSAL's website downloaded from www.animalleague.org/about-us/who-we-are/history/.

165.    NSAL lists the number of pets it rescued from around the country on its website. Upon information and belief, NSAL rescued at least 3,562 pets from 13 states and Puerto Rico between December, 2010 until December, 2014.  *See* Ex. 11.

166.    Precious Pups Rescue in Long Island was "shut down by the state attorney general's office for allegedly 'flipping' puppies and illegally reselling sick animals to unsuspecting consumers" in March 2015.

> Prosecutors said the [rescue] . . . had procured puppies from shelters both in and out of New York and then resold them from their Calverton storefront while pocketing "adoption fees" of between $200 and $600. 'Zambito and Torillo-Hooghkirk sold consumers dogs they claimed were healthy, vaccinated, spayed or neutered, and evaluated by a veterinarian, when in fact, they were not,' a news release from state Attorney General Eric Schneiderman's office said Prosecutors said many of the animals suffered from a variety of illnesses and showed signs of illness, including coughing, scratching, matting and sores. Several of the animals died, while others suffered severe medical complications and had to be euthanized, authorities said.

Attached hereto as **Exhibit 55** is a true and correct copy of <u>AG: Long Island pet rescue closed after selling sick dogs</u>, Examiner.com (March 15, 2015, 7:51 pm) downloaded from http://www.examiner.com/article/ag-long-island-pet-rescue-closed-after-selling-sick-dogs.

49

167.    Rescues and Shelters obtain dogs and cats from random largely unregulated sources and transfer ownership (a/k/a/ sell) these animals to consumers, usually for a fee, for as much as $600.  *Id*.

168.    These pets, from allegedly horrid conditions, are the most likely animals to suffer from the diseases and conditions that Johnson and Crowley complained unwitting pet owners would be unable to afford to care for.  Federal and state animal and public health officials have warned consumers about the high risk of infectious disease from "rescue" animals.  *See* Ex. 53.

169.    NSAL describe puppy mills as "mass breeding operations that run solely for the purpose of making money . . . [where puppies] are often born with illnesses, genetic deformities and behavior and/or health problems" warning people not to buy puppies from Pet Shops.  But, then they offer puppies for adoption from the very worst conditions, describing them as adorable and amazingly resilient animals.  Attached hereto as **Exhibit 56** is a true and correct copy of NSAL's website downloaded from http://www.animalleague.org/rescue/pet-rescue-programs/puppy-mill-rescue/what-is-a-puppy-mill.html.

170.    In a press conference held by Comptroller Stringer on April 19, 2015 on conditions uncovered at AC&C, Stringer refers to "storage practices [that] would make your stomach crawl . . . In Manhattan, we found vaccines and animal remains in the same fridge . . . Incredibly, we found 499 occasions of expired drugs being given to animals."  See Ex. 29.

171.    Rescues and Shelters selling pets with infectious diseases or congenital conditions, vaccinated with mishandled vaccines, are not required to provide a guarantee of health to consumers, while Pet Shops are required to provide a guarantee or: pay for expenses related to veterinary care required; refund the purchase amount; or exchange the pet for a different pet.

## D.   The Laws Violate The Commerce Clause Because They Are Overly Broad

172.   Pet Shops do not cause pet overpopulation or contribute to shelter population.

173.   Upon information and belief, contrary to unsubstantiated statements and testimony, Pet Shop pets do not result in overpopulation or end up in the City's animal shelters to any significant degree.

174.   Most puppies purchased from Pet Shops are neutered before the pet is six months old.   "[Dr. Weinstein] went through the records of . . . [his] office, and . . . [they] see about a 90 to 95 percent of everyone that buys a dog from a pet store by six months of ages has them spay[ed] or neutered."   *See* Ex. 14, at page 105, lines 6-10.

175.   With no credible evidence, Johnson said "while shelters spay and neuter the animals they receive, Pet Shops release unaltered animals to the public, and these animals breed litters that too often end up in the shelter and rescue system."   *See* Ex. 12, at page 9, lines 5-9.

176.   Most puppies are microchipped before sale from Pet Shops.   No proof that microchipped dogs and cats in the City's Shelters or Rescues where purchased from Pet Shops.

177.   If Pet Shops puppies are the source of overpopulation in the City and end up in the Shelters, it would be easy to substantiate those facts.

178.   Pit bulls are the most prevalent breed in Shelters, according to Risa Weinstock, from the AC&C, and Crowley.   Weinstock testified that a lot of the overpopulation problem at Shelters comes from irresponsible pet ownership and breeding for profit, particularly of pit bulls which sell for over $1000 dollars per puppy adding that "[t]he majority of the dogs that we take in and the majority of our population are pit bulls and pit bull mixes . . ."   *See* Ex. 52, at page 52 line 9 to page 53 line 12.

179.   Of the 110 dogs available for "adoption" from AC&C on April 19, 2015, 94 were identified as pit bulls or pit bull mixes.   Only one of the other 16 dogs was described as a

51

purebred dog.  Attached hereto as **Exhibit 57** is a true and correct copy of the list of available

dogs on April 19, 2015 downloaded from wwwPetHarbor.com.

180.    The Pet Shops do not sell pit bulls.

181.    According to the 2013 Progress Report Mayor's Alliance for NYC's Animals

there has been a remarkable decline in the euthanasia of un-owned dogs and cats in the Shelter.

> [I]n 2013, 2,601 dogs were euthanized, of that 832 were euthanized at the request
> of owners, and euthanasia of dogs and cats, excluding owner-requests has been
> reduced by 81% in 2013 since 2003, resulting in 25,577 fewer deaths.

Attached hereto as **Exhibit 58** is a true and correct copy of the 2013 Progress Report

Mayor's Alliance for NYC's Animals downloaded from

http://issuu.com/mayorsalliancenyc/docs/march_28_2014_progress_report_2013.

182.    Upon information and belief, many dogs that were euthanized were unhealthy and

untreatable, or not behaviorally suitable candidates for adoption.

183.    Upon information and belief, the information clarifying euthanasia for health

and/or behavioral issues, owner-requested euthanasia, and euthanasia of dogs and cats that could

have been sold was misrepresented at the Committee Hearings on April 30, 2014 and November

24, 2014.

184.    As stated in the NYPWA's press release, dated January 22, 2015, NYPWA

President, Cynthia Daluise noted that, by adopting these laws, "the city, in fact, is promoting

animal cruelty."  Attached hereto as **Exhibit 59** is a true and correct copy of the NYPWA press

release.

185.    At the Committee hearing on April 21, 2015, eight Pet Shop owners or their

representatives, ten veterinarians or their representatives, one Hobby Breeder, and one USDA

Class B licensee testified about the Council's failure to amend Local Laws 5 and 7.  Those Laws

still included provisions that essentially ban the sale of dogs and cats as they are obtained by and sold from Pet Shops in the City.

## X. DEFENDANTS VIOLATE 42 U.S.C. § 1985 BY CONSPIRING AND COLLUDING

186.   Plaintiff repeats and realleges the foregoing allegations as if more fully set forth at length herein.

187.   Rosenthal and Defendants Crowley andJohnson have conspired with each other to mislead fellow legislators and the Governor about the true intention of the laws they sponsored and championed, relying on false statements from activists, and defaming and disparaging law-abiding NYPWA-members, whom they intentionally targeted to destroy their reputations, good will and businesses.

188.   Rosenthal and Defendants Crowley and Johnson conspired for the purpose of depriving NYPWA-members of their rights to the equal protection of the laws that allow them to breed, purchase, and sell dogs and cats from Pet Shops in the City, as otherwise permitted by the AWA, regulations related thereto, and State laws.

189.   Rosenthal, with the assistance of ARO's, introduced an amendment to the State law preempting municipal regulation of Pet Shops that sell cats and dogs.  On January 9, 2014 those preemption provisions were repealed when the Governor signed into law Chapter 553 of the Laws of 2013 and Chapter 5 of the Laws of 2014.

190.   The State amendments were described in Governor Cuomo's press release:

The new law authorizes municipal governments to enact more stringent laws than those currently existing at the state level by removing the current preemption on municipalities to enact their own laws regulating or licensing pet dealers. Any new local ordinance must be at least as stringent as state law and ***must not result in the banning of the sale of dogs and cats raised in a safe and healthy manner***.

(Emphasis added).  *See* Ex. 27.

191.     According to the Governor's Approval Memo #16, Governor Cuomo was
concerned that the law would harm "***responsible*** breeders and pet stores."  The Governor signed
the law after "legislators agreed to address these concerns."  Attached hereto as **Exhibit 60** is a
true and correct copy of the Governor's Approval Memo #16, NEW YORK STATE LEGISLATIVE
ANNUAL, 373-374 (2013) (emphasis added).

192.     In both publications from the Governor, the word "all" does not appear as it does
in the amended laws.

> Nothing in this article shall be construed to (a) limit or restrict agents or officers
> of societies for the prevention of cruelty to animals or the police from enforcing
> other provisions of article twenty-six of this chapter or any other law relating to
> the humane treatment of or cruelty to animals, (b) limit or restrict any
> municipality from enacting or enforcing any authorized local law, rule, regulation
> or ordinance of general application to businesses governing public health, safety
> or the rights of consumers, or (c) limit or restrict any municipality from enacting
> any local law, rule, regulation or ordinance governing pet dealers, including the
> source of animals offered for sale by pet dealers, whether spaying or neutering of
> such animals is required before sale, and the health or safety of animals
> maintained by pet dealers provided, however, that no such local law, rule,
> regulation or ordinance shall be less stringent than the applicable provisions of
> this article or essentially result in the banning of all sales of dogs or cats raised
> and maintained in a healthy and safe manner and provided, further, that where a
> penalty may be authorized for the violation of such a local law, rule, regulation or
> ordinance, the authorized penalty in such local law, rule, regulation or ordinance
> may not exceed a civil penalty of up to five hundred dollars. Where a
> municipality adopts such a local law, rule, regulation or ordinance that is more
> stringent than the applicable provisions of this article, such municipality shall
> have sole responsibility for enforcement of such specific law, rule, regulation or
> ordinance that is more stringent than the applicable provisions of this article.

NY Gen Bus § 753–d.

193.     Upon information and belief, the Governor and State legislators were not aware
that Rosenthal included the word "all" to permit municipalities to ban essentially all sales of
dogs and cats.  Rosenthal revealed her intentional use of the statutory language when she
testified before the Committee, applauding the introduction of the laws she enabled.  She
confirmed that every word in the law was carefully selected.  "My staff and I and many of the

advocates in this room, and many more statewide who are not here today struggled for more than

a year over every single word contained in the final law." *See* Ex. 12.

194.    Rosenthal confirmed in response to questions during the hearing on April 30,

2014 that including the word *all* in her amendment would permit municipalities to ban

*essentially all* sales of dogs and cats as long as it did not ban 100% of sales.

> Municipalities can require that any percentage of animals that amounts to less
> than one hundred percent of all animals sold or offered for sale are sourced from
> shelters or rescues.
>
> . . .
>
> The language was written to allow municipalities to ban the sale of animals that
> are not raised and maintained in a healthy and safe environment. For animals that
> are raised and maintained in a healthy and safe environment, municipalities are
> specifically empowered through this law to regulate pet dealers ***up until the point
> that the regulation would essentially represent a total ban on all sales of healthy
> and safely maintained animals from a particular source***. (emphasis added).

*See* Ex. 52, at 68:2-21.

195.    Crowley colluded with Rosenthal to get the State bill passed by introducing a

resolution in the City "calling on the New York State Legislature to pass and the Governor to

sign A.740" (and senate versions-S.3735), which was approved by the Council on June 12, 2013

(Res 1798-2013.)  Crowley admitted that she worked behind the scenes with Rosenthal.  Johnson

admitted that the laws were intended to address out-of-state, national concerns.

196.    Crowley, Johnson and Rosenthal intentionally introduced laws to legislate

conduct outside the City and State.  A Council report specified that "[m]ost of the puppies sold in

New York City pet stores come from puppy mills in the Midwest."  *See* Ex. 10.

197.    Rosenthal, Johnson, and Crowley intentionally introduced legislation with the

improper intent to stop the sale of puppies from breeders and distributors outside the State to Pet

Shops in the City, which they knew would result in a ban on sales of puppies from Pet Shops to

consumers in the City. The State law which Crowley and the Council supported by resolution
enabled the local laws which Rosenthal reciprocally supported and which intentionally shutter
Pet Shops by banning sources of animals the stores rely upon and by requiring mandatory
sterilization before sale, which Defendants knew could not be done without breaking other laws
or killing puppies.

198.   At the April 21, 2015 Committee Hearing, in response to the overwhelming
objections to the mandatory sterilization of puppies from veterinarians and Pet Shop owners,
Johnson revealed the true intent of Local Law 7 was to require Pet Shops to stop selling puppies,
knowing that surgery at such a young age would harm many and kill others.

> If you decided that you're uncomfortable based on your veterinarian's advice or
> your own beliefs that you did not want to spay or neuter an eight week puppy or
> kitten or a 10 week puppy or kitten or a 12 week puppy and kitten, you don't have
> to do that. That's up to you. That's still within your rights.

*See* Ex. 14, at 100:6-12.

199.   In response to Johnson's revelation that the real intention of Local Law 7 was to
require Pet Shops to sell older animals, if any, a Pet Shop owner said "I also heard you say we
don't have to . . .[sterilize] at eight weeks. That's . . . facetious. You know that a pet shop sells
dogs between eight to twelve weeks, and that's the most . . . [optimal] time to sell and an owner
to bond . . ." *See* Ex. 14, at 112:21-25.

200.   Johnson lives steps from a NYPWA Pet Shop that, like most Pet Shops, sells
puppies generally before they are twelve weeks old. Johnson admitted he visited the Pet Shop,
unbeknownst to the owner or manager of the store. Johnson also knows that Pet Shops rely on
sales of puppies generally less than twelve weeks of age to remain profitable, and supported the
language of Local Law 7 knowing that Pet Shops and veterinarians would not perform surgery

on animals this young, and that Pet Shops would therefore go out of business.  *See* Ex. 14, at

108:4-7.

201.    Defendants relied on unsubstantiated, defamatory, and derogatory statements

from ARO's, with decades-long campaigns to destroy Pet Shops and their sources, and worked

closely with them to craft the laws that would have the desired effect to promote their beliefs to

the detriment of others.

202.    ASPCA and HSUS were cited in the Council's June 7th report on Res 1798-2013.

According to the ASPCA, 'Our local governments and animal shelters absorb the
costs associated with unregulated breeders and unwanted pet store dogs through
cruelty seizures, sheltering costs and legal proceedings.'  Puppy mills breed large
numbers of dogs several times a year, keep animals in cramped conditions often
with inadequate food and water, and ship them hundreds of miles to pet stores.
Nationwide, the Humane Society estimates that there are at least 10,000 puppy
mills that are producing up to 4 million puppies a year.

These statements are not credible and not substantiated.  *See* Ex. 27.

203.    In the absence of credible evidence, Rosenthal testified that Pet Shops sell sick,

deformed "puppy mill" dogs.

[T]he vast majority of dogs offered for sale in pet stores across the country are in
fact the product of puppy mills, and they are afflicted with serious congenital
defects, caused by the poor breeding practices employed by the mills, which are
exacerbated by the poor conditions in which the animals are forced to live.

*See* Ex. 52, at 63:25 – 64:8.

204.    Johnson defamed and disparaged commercial breeders and Pet Shops accusing

them of deceiving pet owners of the source of the animals they sell, claiming they are selling sick

"puppy mills" animals without any evidence to support his statements.

Large scale commercial breeders have contributed to significant pet
overpopulation and have been a persistent source of animals with serious
behavioral problems and costly medical conditions.  These animals are often sold
to unwitting customers who are deceived by false claims that a pet store does not
deal with puppy mill animals or who receive no information about the animal's
source.

57

*See* Ex. 52, at 6:21 – 7:16.

205.     Rosenthal and Defendants Crowley and Johnson and ARO's maligned Class B USDA licensees at Committee Hearings and Council meetings, portraying them as evil middlemen, and intentionally ignoring evidence to the contrary.  Rosenthal described Class B brokers as "[t]he dark middlemen of the pet industry, brokers shroud the source of animal sold in mystery preventing municipalities from protecting consumers and animals . . . at a minimum the source of animals sold by brokers cannot be confirmed."  *See* Ex. 12, at 126:9-21.  Johnson said that "[b]rokers are intermediaries who obtain dogs and cats from breeders, and provide them to pet stores.  Several witnesses at our last hearing testified that brokers can be bad actors who obscure the true source of an animal and provider cover for puppy and kitten mills."  *Id*., at 7:6-11.  Crowley stated that "[t]he bill prohibits the sale of cats and dogs obtained from brokers, who as middle men give pet stores the ability to plead ignorance about the breeders that produce the animals they sell. And make false claims that they are puppy mill free."  *Id*., at 13:11-15.

206.     At the hearing on November 24, 2014, Michael Gill, a pet store owner who had just recently converted to a rescue operation was brought in from Pennsylvania to testify, and made false, disparaging remarks about Hunte, with no evidence to support any of his statements.  For example, he said that Hunte falsifies their documents.  Stolkey responded to these false disparaging remarks when he testified on April 21, 2015.

> The ONLY thing false here is his statement.  We are state and federally licensed, thus regulated and inspected AND FULLY compliant to all animal welfare laws.  IF his allegations were true, Hunte would either lose our license or be cited by government inspectors.  Without ever having been in our facilities, Gill testified that our operating procedures were deficient and our veterinarians did not properly examine our puppies.  How can he become such an expert to a process he never witnessed?  Gill also said that 70% of our puppies were sick for up to 2 weeks.  In our world, ANY discussion of puppy health is ALWAYS linked to bio security measures, or in his case, a potential lack of measures.  IF blaming Hunte is meant to be reflective of OUR level of overall performance, how does one

explain our market position?  The fact is, IF true, we would NOT be in business and consequently, there would be no need for a ban based on these smears and innuendos.

*See* Ex. 14, at 79-87; **Exhibit 61** is a true and correct copy of Stolkey's written testimony submitted to the Committee on April 21, 2015.

207.    Local Laws 5 and 7 were introduced as proposed ordinances on February 26, 2014 and March 12, 2014, respectively, by Crowley, as the primary sponsor.  Committee hearings were held on April 30, 2014 and November 24, 2014, which were predominantly attended by ARO's, many of whom had been working with Defendants to draft the state law and proposed ordinances.

208.    The Committee adopted amendments suggested by the ARO's, including the mandatory sterilization of dogs and cats without the exemptions originally included in Int. 136, and the wholesale ban of sales from Class B USDA licensees and Hobby Breeders, which was not originally included in Int. 55.  The Committee ignored the voluminous testimony and evidence from veterinarians and scientists that mandatory gonadectomy harms dogs by eliminating hormones that are important for normal growth, and increases the incidence of metabolic disorders and certain forms of cancer in their absence.  The Committee amended Int. 55 on November 24, 2014 to ban all sales from Class B USDA licensees based, on information and belief, on defamatory statements about Hunte and Class B USDA licensees, made by representatives of the ASPCA, HSUS, CAPS, and others at the April 30, 2014 hearing.

### COUNT I
### DECLARATORY RELIEF (Federal Preemption)
### (Against All Defendants)

209.    Plaintiff repeats and realleges the foregoing allegations as if more fully set forth at length herein.

210.    Local Law 5 § 17-1702 which bans the purchase to Pet Shops from Class B

USDA licensees and Hobby Breeders is preempted by the AWA which was purposely

established by Congress to regulate and license commercial dog and cat breeders within and

between the states.

211.    Congress established a comprehensive licensing scheme in the Animal Welfare

Act to license Class A and B licensees and the process required to terminate a license.  7 U.S.C.

§ § 2133, 2149.

212.    The AWA and related regulations define, classify, and set forth parameters for the

licensure of pet breeders and dealers who sell dogs and cats in interstate commerce.  7 U.S.C.

§§  2132 (c), (f); 7 U.S.C. § 2133.  The federal law exempts certain breeders from licensing

while still permitting them to sell pets in inter and intra-state commerce, including sales to Class

B USDA licensees.  9 CFR § 2.1 (3)(ii), (iii).  The AWA provides for notice and hearing for

licensees subject to temporary or permanent license revocation, prior to the assessment of civil

penalties, and for appeals to such action.  7 U.S.C. §§ 2149 (a), (b), (c); 9 CFR §§ 4.10, 4.11.

213.    Class A and B USDA licensees have a license issued by USDA to breed and sell

animals, and purchase and resell animals, respectively.

214.    Law 5 incorporates the AWA definitions of "Class B" licensees, but bans sales to

City Pet Shops from all Class B USDA licensees, excluding access to the City's pet market with

no credible evidence of wrongdoing by these licensees, and no allegations that they had violated

the standards of care section of the AWA and related regulations.  7 U.S.C. § 2143; 9 CFR

§§ 3.1-3.19.  The also AWA requires USDA licensees to maintain records "with respect to the

purchase, sale, transportation, identification and previous ownership of animals . . ." 7 U.S.C.

§ 2140; 9 CFR § § 2.75-2.80.

215.     The only allegations against Class B USDA licensees are assertion that all Class B USDA licensees are evil middlemen who conceal the sources of animals they sell.  There are no specific allegations regarding any specific transaction involving Class B USDA licensees, and no citations of alleged record-keeping offenses by these licensees on any USDA inspection report.

216.     Local Law 5 § 17-1702 is preempted by the AWA by terminating the federally-provided USDA license of Class B USDA licensees and prohibiting Hobby Breeders from selling puppies in interstate commerce to Pet Shops in the City.

217.     There is no savings clause in the licensing and inspection sections of the AWA.  As drafted, Local Law 5 vitiates the licensing scheme of the AWA.   Local Law 5 is preempted by the AWA which was purposely established by Congress to regulate and license commercial dog and cat breeders within and between the states.

218.     Declaratory relief will resolve this controversy.

219.     Accordingly, NYPWA respectfully asks this Court to declare section 17-1702 of Local Law 5, prohibiting sales from Class B USDA licensees and Hobby Breeders to Pet Shops preempted by the AWA and are therefore invalid.

**COUNT II**
**DECLARATORY RELIEF (State Preemption)**
**(Against All Defendants)**

220.     Plaintiff repeats and realleges the foregoing allegations as if more fully set forth at length herein.

**A.     Banning Sales Of Dogs And Cats From Pet Shops Is Preempted By State Law**

221.     The mandatory sterilization provisions in Local Law 7 and the sourcing restrictions in Local Law 5, that will essentially ban all sales of puppies and kittens from Pet Shops, are preempted by N.Y. Gen. Bus. § 735-d, which prohibits jurisdictions from adopting

61

local ordinances which "essentially result in the banning of all sales of dogs or cats raised and maintained in a healthy and safe manner . . ."  N.Y. Gen. Bus. § 735-d.

222.    Small family run businesses operating Pet Shops in the City have to face a grim choice-either subject the puppies they sell to unnecessary surgery, risking their lives, or stop selling them altogether.  That is, assuming they can find a veterinarian who will perform the surgery, since their current veterinarians will not, and assuming they can readjust their long-established business model relying on sales from legally valid USDA licensees and Hobby Breeders which the City has banned.

223.    Local Law 7 requires the mandatory sterilization of dogs and cats prior to sale from Pet Shops, without exception, as long as the animal is at least eight weeks of age and weighs at least 2 pounds.  Veterinary care is required for all pet dealers.  NY Agri & Mkts § 401 (5).  If a Pet Shop cannot find a veterinarian willing to perform the surgery it will be unable to sell its dogs and cats.

224.    Local Law 5 essentially bans the sale of puppies since it bans sales from the Pet Shops' most common sources of puppies-Class B USDA licensees, Class A USDA licensees who sell to Pet Shops indirectly through Class B USDA licensees, and Hobby Breeders who sell directly or indirectly through Class B USDA licensees.  Local Law 7 essentially bans the sale of puppies because Pet Shops cannot or will not sterilize these animals when they are 8-12 weeks of age.

225.    NYPWA-members' businesses revolve almost exclusively around the breeding and sale of 8-12 week old puppies to consumers.  Pet Shops have equipped their stores with age-appropriate enclosures and equipment to provide for the health and welfare of their animals. Customers want to purchase puppies between 8-12 weeks of age, the age at which optimal

human-animal bonding occurs.  Delaying sales of puppies beyond the optimal age for socializing will traumatize the animals and result in undesirable behavioral traits that will decrease the likelihood of successful lifelong pet ownership.  Even if Pet Shops decided to sell older animals, there are no sustainable sources of purebred or specially-bred older animals for such purposes. Pet Shops are intentionally precluded from selling Shelter or Rescue animals for a profit.

226.    Local Law 5 bans purchases from all Class B USDA licensees to Pet Shops in the City.  Once enforced, Pet Shops will only be able to buy dogs and cats directly from Class A USDA licensees.  Most Class A USDA licensees reside far outside of the City and do not sell directly to Pet Shops.  Class B USDA licensees provide an important service for Class A USDA licensees, Hobby Breeders and Pet Shops by matching up the puppies and kittens Pet Shops want for their customers with reputable breeders who breed and raise healthy, specially bred puppies and kittens often exceeding the standard of care required by federal and local laws.  The logistics, time, and resources needed to make these sales exceeds the capability of the breeders who sell to Class B USDA licensees.  In addition to reviewing USDA inspection reports, Pet Shops also rely on their Distributors and Brokers to visit the breeders' facilities personally and ensure the animals are properly cared for.  Pet Shops will not be able to obtain enough puppies from Breeders directly to sustain their businesses.

227.    The Laws essentially ban the puppies and kittens which NYPWA-members rely upon to maintain their lawful family businesses.  Without these sales the Pet Shops will no longer be profitable and stores will close.  Pet Shops will be irreparably harmed by the Laws, which are preempted by State law, until they are declared invalid, and stricken or drastically amended.

B. **Local Laws 5 And 7 Conflict With Pet Shop Requirements In State Laws**

228.    The Laws are preempted by and conflict with State laws that require a pet dealer

(including Pet Shops): (1) to have dogs and cats examined by a veterinarian within five business

days of receipt, but prior to the sale of any dog or cat "to determine if the animal has any medical

conditions that adversely affects the health of the animal," NY Gen Bus § 753-a; (2) deliver to

the purchaser of an animal, at the time of sale, a written statement that includes a record of any

veterinary treatment or medication received by the cat or dog, and signed statement that the dog

or cat has no known disease or illness or congenital or hereditary condition at the time of sale,

and a signed statement from a veterinarian authorizing that sale that any such condition does

require hospitalization or non-elective surgery and will is not likely to require such care in the

future, NY Gen Bus § 753-b; and (3) warranty that a dog or cat sold is not unfit for purchase due

to illness or the presence of symptoms or a contagious or infectious disease for fourteen days

following the sale, and that such animal is not unfit for purchase due to a congenital

malformation which adversely affects the health of the animals for one hundred either days

following such sale.  NY Gen Bus § 753 ("Puppy Lemon Law").  The sterilization mandate in

Local Law 7 makes it impossible for Pet Shops (and veterinarians) who sterilize dogs and cats

before sale to comply with these State laws.

229.    Sterilization at any age creates potential health risks, both short and long term.

Any dog or cat sterilized before sale will have medical conditions (lack of endocrine hormones)

known to adversely affect their health.  Animals sterilized at younger ages are more likely to

exhibit physical malformations resulting from the lack of hormones.  Stress from surgery will

decrease the animal's ability to fight off infectious diseases that normally do not result in illness,

particularly when animals are housed in environments, like Pet Shops, which are not bio-secure.

Puppies and kittens are even more susceptible to post-operative infections because their immune

systems are still developing.  To comply with the State laws, some of which are incorporated into Local Law 5, a Pet Shop will have to inform each customer of their pet's sterilization, required by Local Law 7, and the consequences thereof, which could risk that animal's health at the time of sale and into the future.  In addition to the limited warranty required for contagious diseases and congenital disorders, this disclosure could render the Pet Shops liable for the future negative health effects of gonadectomy.

230.     Sterilization prior to sale will increase the cost of business for the Pet Shops beyond sustainability.  The warranties in the State Puppy Lemon Law ensure that consumers are buying healthy dogs and cats with a minimal risk of short and long term disorders.  Based on scientific evidence, the mandatory sterilization of dogs and cats will result in their diminished health, and surgical stress will result in the increased incidence of infectious diseases in naively-immune puppies and kittens housed in Pet Shops after surgery and before sale.  Pet Shops will have to reimburse owners for the veterinary fees resulting from the additional medical care these animals will require.  Those costs will decrease profits from puppy and kitten sales which, in addition to the costs of surgery and postoperative care, will render such sales unprofitable.  Pet Shops rely on these sales to stay in business.  If no longer in business, Pet Shops will be unable to honor existing warranties.

231.     Pet Shops also cannot comply with the State law, incorporated into Local Law 5, requiring them to provide each customer "a statement signed by a licensed veterinarian that . . . verifies [any identified] condition, disease or illness does not require hospitalization or non-elective surgical procedures, and is not likely to require hospitalization or non-elective surgical procedures in the future," because veterinarians cannot make such predictions after performing mandatory sterilization with known health risks.  NY Gen Bus §§  753-b (1)(e)(ii), (2)(e)(ii);

65

Local Law 5 § 17-1703 (10) (b).  Pet Shops will be unable to comply with the Puppy Lemon Law and Local Law 7 and remain profitable.

232.    Local Law 7 is also preempted by and conflicts with the State animal cruelty statute which defines "[a]nimal cruelty" as "every act, omission, or neglect whereby unjustifiable physical pain, suffering or death is caused or permitted."  NY Agri & Mkts§ 350 (2).  "A person who . . . unjustifiably injures . . . or kills any animal . . . is guilty of a class A misdemeanor . . . of the criminal procedure law . . . ."  *Id.*, at § 353.  Mandatory sterilization, particularly if performed on eight to twelve week old puppies and kittens from a Pet Shop, carries known risks from the surgical procedure, increased risk of post-operative infectious diseases, and long-term risks of endocrine hormone deficiency.  Pet Shops permitting such procedures could be accused of unjustifiably injuring or killing dogs and cats, a violation of the State animal cruelty statute.  Pet Shops cannot comply with both Local Law 7 and the State animal cruelty statute.

## C.   Local Laws 5 And 7 Are Preempted By State Laws Governing The Practice Of Veterinary Medicine

233.    Local Law 7 is preempted by the laws governing the practice of veterinary medicine in the State, pursuant to NY Educ §§ 6500, *et seq.*, 6700 *et seq.*, by not permitting the veterinarian to determine, on a case-by-case basis, whether a patient is sufficiently mature to withstand the rigors of anesthesia and the trauma of major abdominal surgery, particularly in light of the environmental factors inherent at a pet store, where the patient would be housed post-operatively.  If, in their professional judgment, a veterinarian believes surgery will jeopardize the health and welfare of a patient, a requirement to do so anyway violates veterinary standards of care.

234.    The Legislature granted authority to the board of regents to regulate and penalize licensees and to the appellate division of the third judicial department to review decisions of the

board of regents.  N.Y. Educ. §§ 6504, 6510, 6511.  The Board of Regents, on the

recommendation of the Commissioner of Education, appoints a State Board for each licensed

profession to advise and assist the Board of Regents and the State Education Department on

matters of professional regulation.  There are no provisions for a local jurisdiction to step into the

State's shoes and mandate otherwise unnecessary elective invasive procedures, without

exception.

235.    The State, not the City, regulates the practice of veterinary medicine and holds

veterinary licensees accountable if they "[p]ractic[e] . . .  the profession fraudulently, beyond its

authorized scope, with gross incompetence, with gross negligence on a particular occasion or

negligence or incompetence on more than one occasion . . ."  N.Y. Educ. § 6504 *et seq*.

236.    Veterinarians who do not provide the standard of care for their patients may be

liable to the New York State Board for Veterinary Medicine and to their clients.  Knowingly

performing a surgery that places an animal at unnecessary risk would qualify as professional

misconduct.  Any harm befalling a veterinarian's patient if mandatory sterilization is performed

as required by Local Law 7, and in the absence of the informed consent of the pet's owners, even

if caused by the City's directive, exposes that veterinarian to the risk of liability for veterinary

malpractice or professional misconduct.

237.    Veterinarians are also cautioned not to allow any entity to "control, influence, or

exploit the relationship between the client/patient and the veterinarian."  Prof'l Practice NYS,

Guideline § 5.10.  The City has controlled and influenced the relationship between client and

veterinarian by mandating sterilization in complete disregard of this relationship and the safety

and well-being of dogs and cats.

238.    Local Law 7 is preempted by State law because it requires mandatory sterilization without independent professional judgment by a veterinarian to determine if the surgery is indicated and safe for each individual patient.

**D.      Veterinarians Cannot Comply With Local Laws 5 And 7 And Other State Laws**

239.    Mandatory sterilization required in Local Law 7 also constitutes animal cruelty by negligently subjecting puppies to harm thereby exposing veterinarians, as well as Pet Shops, to liability under NY Agri & Mkts § 350(2).  Veterinarians and Pet Shops cannot comply with both Local Law 7 and the State animal cruelty law.

240.    The State also requires that "[e]ach animal shall be handled in a humane manner so as not to cause the animal physical injury or harm [and] . . . [p]re-procedural and post-procedural care in accordance with established veterinary medical and nursing procedures".  NY Agri & Mkts § 401 and Local Law 5 § 17-705.  Veterinarians cannot comply with these provisions while also performing major abdominal surgery of puppies and kittens under general anesthesia, since physical injury will occur in each and every instance of sterilization as an inherent consequence of the surgery.  Established veterinary procedures do not include elective invasive surgery on soon to be individually owned animals housed in Pet Shops before surgery, and recuperating in the Shops post-operatively.

241.    Veterinarians performing mandatory sterilizations of dogs and cats at any age expose themselves to liability by violating these State laws, and also to claims of malpractice from Pet Shops and the pet owners who had not consented to these procedures when the animals were harmed.  Local Law 7 is preempted by State law which requires veterinarians to consult with and receive informed consent from owners of animals before procedures are performed on their pets, particularly when the procedures are elective, invasive, and have well known short and long term health risks to animals.

68

242.   Pet Shops and veterinarian cannot comply with provisions in Local Law 5 § 17-1703 that require them to provide assurances that a dog or cat that was surgically sterilized would not foreseeably have to be hospitalized or undergo surgery in the future.  Every surgical procedure includes risks of potential sequellae including hospitalization and/or surgery.  On a case-by-case basis, a veterinarian is unable to certify that gonadectomy would not result in harm or the need for non-elective procedures or hospitalization in the future.

243.   Absent injunctive and declaratory relief against the City, NYPWA-members will be irreparably harmed by Local Laws 5 and 7, which are preempted by and conflict with State laws by: (i) essentially banning sales of dogs and cats from Pet Shops; (ii) usurping State control of the practice of veterinary medicine placing veterinarians at risk of violating state laws; and (v) mandating sterilization of puppies as young as eight weeks of age–requiring general anesthesia and major abdominal surgery–constituting animal cruelty and resulting in preventable illness, malformation, and death of puppies and kittens.  Wherefore, Plaintiff demands judgment in the form of declaratory relief finding that the Laws, as indicated, are preempted by State law.

<u>**COUNT III**</u>
<u>**42 U.S.C. § 1983 & DECLARATORY RELIEF (Substantive Due Process)**</u>
<u>**(Against All Defendants)**</u>

244.   Plaintiff repeats and realleges the foregoing allegations as if more fully set forth at length herein.

245.   Defendants' deprived NYPWA-members of the rights, privileges, and immunities secured by the Fourteenth Amendment of the Constitution of the United States, the AWA and related regulations.  Defendants deprived NYPWA-members of these rights by introducing and adopting State and City laws−NY Gen Bus § 753-d, and Local Laws 5 and 7−while acting under the color of State and City law.

246.     Defendants deliberately deprived Class B USDA licensees of their valid federally-granted licenses, even after being repeatedly informed that such conduct violates the licensees' constitutional rights.  Local Law 5 prohibits Pet Shops from purchasing dogs and cats from Class B USDA licensees, rendering that license null and void within the City, and violating their right to substantive due process.

247.     Class B licenses have a protectable liberty and property interest in their USDA license which permits them to purchase animals from licensed and exempt breeders, and have a right to resell animals in interstate commerce, as prescribed by USDA regulations enabled by acts of Congress.

248.     Defendants' intentional, wrongful governmental actions, under color of State and City law arbitrarily strips Class B USDA licensees of the right to re-sell purchased dogs and cats to Pet Shops in the City, as vested in their federally-granted licenses.  Defendants' action is irrational because the Laws were passed in bad faith and with malicious intent.

249.     Plaintiff's reputation and good will be irreparably harmed by the malicious and unfounded attacks by Defendants claiming they are "puppy mills" and "the dark middlemen of the pet industry."  Based on their animus and their reliance on the lies of activists who believe all commercial dog and cat breeding is evil and should be prohibited, Defendants have stripped NYPWA members of access to commerce in the City through their USDA licenses.

250.     NYPWA members will suffer irreparable harm by and through these violations of Plaintiff's substantive due process rights under the due process clause of the Fourteenth Amendment, until these laws are declared invalid, and stricken or drastically amended.

251.    Wherefore, Plaintiff demands judgment in the form of declaratory relief finding that the Laws violate its substantive due process rights of the Fourteenth Amendment of the Constitution of the United States, as set forth herein.

**COUNT IV**
**42 U.S.C. § 1983 & DECLARATORY RELIEF (Procedural Due Process)**
**(Against All Defendants)**

252.    Plaintiff repeats and realleges the foregoing allegations as if more fully set forth at length herein.

253.    Defendants' deprived NYPWA-members of the rights, privileges, and immunities secured by the Fourteenth Amendment of the Constitution of the United States, the AWA and related regulations.  Defendants deprived NYPWA-members of these rights by introducing and adopting State and City laws−NY Gen Bus § 753-d, and Local Laws 5 and 7−while acting under the color of State and City law.

254.    Local Law 5 violates Plaintiff's procedural due process under the Due Process Clause, U.S. Const., Amend. XIV, § 1, by prohibiting sales to Pet Shops in the City from Class B USDA licensees without notice or a hearing prior to termination.

255.    Only an USDA Administrative Law Judge can designate a noncompliant item as an actual violation of AWA standards and regulations.  Class B USDA licensees have not been accused of violating the standards of care they provide to their animals or any other section of the AWA.  Class B USDA licensees have not received a final determination from an USDA Administrative Law Judge finding they had violated the AWA.

256.    Instead, the City invalidated all Class B licenses in the City, in the absence of any allegation that any licensee had violated the AWA standards, and without the required notice and hearing.  There are no provisions in the AWA that permit a local jurisdiction to terminate a license without a notice and hearing.  Local Law 5 § 17-1702 violates the procedural due process

of Class B USDA licensees by terminating their license without cause, and with no notice or hearing.

257.    NYPWA-members shall suffer irreparable harm by and through this violation of their procedural due process rights under the due process clause of the Fourteenth Amendment, unless and until these laws are declared invalid, and stricken or further amended.

258.    Wherefore, Plaintiff demands judgment in the form of declaratory relief finding that Local Law 5 § 17-1702 violates its procedural due process rights of the Fourteenth Amendment of the Constitution of the United States, as set forth herein, and are therefore invalid.

### COUNT V
### 42 U.S.C. § 1983 & DECLARATORY RELIEF (Equal Protection Violation)
### (Against All Defendants)

259.    Plaintiff repeats and realleges the foregoing allegations as if more fully set forth at length herein.

260.    Defendants' deprived NYPWA-members of the rights, privileges, and immunities secured by the Fourteenth Amendment of the Constitution of the United States, the AWA and related regulations.  Defendants deprived NYPWA-members of these rights by introducing and adopting State and City laws—NY Gen Bus § 753-d, and Local Laws 5 and 7—while acting under the color of State and City law.

261.    Local Law 5 violates the Equal Protection Act, U.S. Const. Amend. XIV, § 1 by selectively discriminating against Pet Shops and their sources and favoring Shelters and Rescues. Pet Shops, Shelters, and Rescues all transfer ownership of dogs and cats to consumers.  Shelters and Rescues are similarly situated to Pet Shops, as described by City officials and directly compete with Pet Shops.  Shelters function like distributors by transferring dogs and cats to over

140 partner Rescues in the City for the sale.  Defendants introduced and adopted the Laws to maliciously harm NYPWA-members.

262.    Local Law 5 prohibits purchases from all USDA Class B USDA licensees and indirect sales from Class A USDA licensees and USDA exempt breeders to Pet Shops, while at the same time permitting Shelters and Rescues to obtain dogs and cats from these sources and sell them to consumers in the City.

263.    Local Law 7 violates the Equal Protection Act, U.S. Const. Amend. XIV, § 1 by requiring mandatory sterilization of dogs and cats before sold from Pet Shops without exception (as long as they are eight weeks old and weigh at least two pounds), but allows exemptions for Shelters, and has no mandatory requirements for Rescues.

264.    The intent of these Laws and the State law enabling their adoption, was to eliminate the national commercial breeding of dogs, based on extreme animus against such activities and any business entities related thereto, as demonstrated by the testimony of Rosenthal, Crowley, Johnson and ARO's during Committee and Council's hearings, including defamatory statements about Class B USDA licensees, Breeders, Hobby Breeders, and Pet Shops.

265.    The intended effect of the Laws was to selectively discriminate against Plaintiff and favor Shelters and Rescues, as described by DEH Deputy Commissioner Kass stating that the purpose of the law was to make it "more difficult to acquire [dogs and cats] through Pet Shops, or more expensive to acquire puppies or kittens from breeders.  We hope that, overall, the expanded regulation of Pet Shops will encourage New Yorkers to adopt from shelters run by Animal Care and Control."  *See* Ex. 25.

266.   Pet Shops will be unable to compete for the sale of dogs and cats with Shelters, Rescues, and City-exempt breeders who are not affected by these Laws.  City-exempt breeders can sell puppies directly to consumers, but Pet Shops cannot purchase from any Hobby Breeders no matter where they are located and are not subject to the same draconian sterilization mandates facing Pet Shops.  Shelters and Rescues can continue to purchase/obtain dogs from any source including those banned for Pet Shops.  Local Law 7 requires mandatory sterilization of dogs and cats at least eight weeks of age and weighing at least two pounds before they can be sold from Pet Shops without exception, but a Pet Shop that allows an animal shelter or non-profit rescue group to the shop's [p]remises for the purpose of making animals available for adoption shall be exempt from the [mandatory sterilization] requirements . . . provided such pet shop does not have an ownership interest in any of the animals that are made available for adoption."  Local Law 7 § 17-804 (f).

267.   Under a heightened scrutiny standard required when selectively enforcing discriminatory laws, the Laws must substantially further an important government interest.  They do not.

268.   The Laws will decrease the breeding of healthy, well-cared for dogs and cats from properly licensed, compliant USDA licensees and those exempt from licensing but it will incentivize substandard breeders to expand their operations since the Laws favor Rescues who obtain animals directly or indirectly from these sources.

269.   Rescues regularly obtain dogs and cats from the very worst substandard breeders across the country and sell them to consumers in the City, sometimes for as much as $600/animal.  Owners have no assurances or warranties on the health of these animals, or that they have been properly vaccinated or treated with unexpired medications.  Consumers and the

City's resident pets will be increasingly exposed to infectious contagious diseases from the dogs and cats imported from high-risk facilities from across the country through Rescue pipelines. Rescues obtain dogs and cats from across the country, often with diseases, *e.g*., heartworm disease—a condition not seen in pet store animals, and congenital abnormalities, which consumers are not prepared to nor can afford to manage. Many of these animals end up back in the shelter system, compounding, not ameliorating, the alleged overpopulation of animals in the system.

270.    Based on its intent to punish Pet Shops, the Laws selectively include arbitrary and excessive document retention requirements for 5 years imposed only on Pet Shops despite recommendations from AC&C that Pet Shops keep records for 3 years. The Laws also include draconian cumulative penalties.

271.    Absent injunctive relief against the City and declaratory relief that the Laws violate the rights of NYPWA-members to Equal Protection under the United States and State Constitution, Plaintiff will be irreparably harmed by impermissibly favoring Shelters and Rescues exposes consumers to infectious diseases and congenital disorders in puppies sourced from unreliable and substandard breeders imported for sale. Wherefore, Plaintiff demands judgment in the form of declaratory relief finding that the Laws violate the Equal Protection Clause of the United States Constitution.

### COUNT VI
### 42 U.S.C. § 1983 & DECLARATORY RELIEF (Commerce Clause)
### (Against All Defendants)

272.    Plaintiff repeats and realleges the foregoing allegations as if more fully set forth at length herein.

273.    Defendants' deprived NYPWA-members of the rights, privileges, and immunities secured by the Constitution of the United States, the AWA and related regulations. Defendants

deprived NYPWA-members of these rights by introducing and adopting State and City laws−NY Gen Bus § 753-d, and Local Laws 5 and 7−while acting under the color of State and City law.

274.    Defendants have intentionally, and in practice impermissibly, directly regulate, discriminate against and excessively burden USDA licensees and Hobby Breeders engaged in interstate commerce of dogs and cats.

275.    Local Law 5 impermissibly controls commerce and discriminates against USDA Class A and B licensees and Hobby Breeders outside the State in favor of Shelters and Rescues within the State who will economically benefit from the Laws.  Local Law 5 burdens the flow of interstate commerce and is unconstitutional under the Commerce Clause, U.S. Const., Art. I § 8, cl. 3 *et seq*. by entirely banning Pet Shop purchases from USDA Class B USDA licensees and USDA exempt breeders.  Since the purpose of the Laws is to discriminate against commerce from another state and to favor the local economic interests of Shelters and Rescues in the City, it is invalid under the Dormant Commerce Clause.

276.    The Laws were introduced and adopted for an improper purpose to impermissibly regulate extraterritorially.  "We recognize that the Council cannot legislate directly over puppy and kitten breeders who are outside the City . . ."  *See* Ex. 25.  "Taken together, these bills will enable the city to . . . join the nationwide effort to keep bad actors out of the pet supply chain." *See* Ex. 12, at 10:13-18.

277.    Local Law 5 does not advance a legitimate local purpose, because Defendants with great malice, intentionally passed Laws intended to put USDA Class A and B licensees, Hobby Breeders, and Pet Shops out of business and at the same time to favor the local economic interests of Rescues and Shelters who compete in the same market with City Pet Shops. Concerns about "puppy mills" address a national, not a local concern, which should be addressed

76

through the USDA, responsible for enforcing the AWA, or through Congress, responsible for amending the federal law. These nondiscriminatory alternatives would adequately preserve the local interests at stake, without improper extraterritorial actions.

278.    The alleged local benefits flowing from the statute do not justify the Laws. Benefitting Shelters and Rescues who import animals from substandard facilities, where animals are irresponsibly bred, exhibit behavioral and congenital disorders and are exposed to infectious diseases cannot justify laws which essentially ban the sale of healthy puppies from regulated, licensed breeders and dealers. ARO's including those in the City, and Shelters and Rescues make millions of dollars and will benefit economically from the Laws, even more than they currently do, once the Pet Shops are out of the picture or financially disabled.

279.    The local interest in decreasing overpopulation and euthanasia of adoptable animals will not be achieved by these Laws, since purebred and specially-bred animals sold from Pet Shops contribute to a *de minimis* degree, if at all, to overpopulation. Pet Shop dogs and cats are uniformly spayed or neutered or responsibly bred and do not contribute animal overpopulation in the City. As Shelter officials admitted, the vast majority of dogs in the shelter are pit bulls or crosses, which Pet Shops do not sell.

280.    The Laws are not rationally related to the stated local interest of banning puppy mills, because those substandard breeders are the source of hundreds and thousands of dogs imported into the City by Rescues for sale to consumers.

281.    Local Law 5 fails to protect the health and well-being of dogs and cats and incentivizes the proliferation of unlicensed and substandard breeding operations. The Laws are overly burdensome on USDA Class A and B licensees, Hobby Breeders, and Pet Shops who are highly regulated by federal, state and local officials and provide the safest, healthiest pets. The

Laws are under-inclusive by permitting Rescues and Shelters to continue to regularly obtain animals from the very worst substandard facilities around the country and bring them to the northeast and the City for sale. Defendants encourage consumers to obtain their pets from Rescues and Shelters, which, in effect, supports the very worst animal husbandry practices, endangering animals, facts which Defendants ignored.

282. NYPWA-members shall suffer irreparable harm by the Laws which violate the Dormant Commerce clause until they are declared invalid, and stricken or drastically amended. Wherefore, Plaintiff demands judgment in the form of declaratory relief finding that the Laws, as described herein, violate the Commerce Clause of the United States Constitution.

**COUNT VII**
**42 U.S.C. § 1985**
**(Against Defendants Crowley and Johnson)**

283. Plaintiff repeats and realleges the foregoing allegations as if more fully set forth at length herein.

284. Rosenthal and Defendants Crowley and Johnson conspired with each other and ARO's, under color of law, to interfere with and deprive NYPWA-members' rights to equal protection of the laws that allow them to breed, purchase, and sell dogs and cats from Pet Shops in the City, as otherwise permitted by the AWA, regulations related thereto, and State laws, based on their invidious discriminatory animus against NYPWA-members who shall suffer irreparable harm as a result until these laws are declared invalid, and stricken or drastically amended.

285. Rosenthal, with the assistance of ARO's, introduced an amendment to the State law preempting local jurisdictions from adopting laws governing the sale of pets, so long as they do not essentially ban the sale of dogs and cats which Crowley and Johnson supported in their official capacity as council members.

286.    Rosenthal intentionally included the word "all" in the statutory amendment to permit municipalities to adopt ordinances that essentially result in the banning of *all* sales of dogs or cats and without disclosing these intentions to other legislators or the Governor.

287.    Rosenthal, Crowley and Johnson intended harmful consequences, namely the elimination of puppies from Pet Shops in the City, resulting in their demise, but intentionally concealed their intentions from state officials.

288.    Crowley and Johnson introduced and then amended Local Laws 5 and 7 to ensure that Pet Shops could not continue to sell puppies.  The Laws were drafted to favor Shelters and Rescues and put Pet Shops that sell dogs and cats out of business.

289.    Local Law 7 mandates sterilization of dogs and cats that are at least eight weeks and two pounds before sale, without exception.  Johnson revealed that his intention was to ban sales of puppies but permit Pet Shops to sell older animals, a business model that Defendants know cannot succeed.  Breeders cannot keep puppies and kittens for months and continue their regular operations.  Pet Shops cannot house older dogs and cats and provide for their developing behavioral needs during their critical socialization period.  Dogs and cats will be traumatized by delaying placement in their permanent homes during the optimal period for socialization and bonding with humans.  Resultant abnormal behavioral traits will decrease the likelihood of lifelong pet ownership and increase the likelihood that they will be abandoned.

290.    Defendants intentionally prohibit Pet Shops from selling Shelter or Rescue dogs and cats for a profit, while encouraging consumers to buy from Shelters and Rescues, who make profits from the sale of pets they import from the very worst substandard breeders.

291.    The basis for these Defendants' conspiracy was their discriminatory animus against the commercial breeding dog industry in general, including Pet Shops, dog breeders

79

licensed by USDA or exempt from such licensure, and most vociferously, Class B USDA
licensees.

292.    Without even the most basic facts about the Pet Shops in the City, including how
many Pet Shops allegedly actually buy and sell puppies obtained from "puppy mills,"
Defendants improperly colluded to ban the sale of puppies from Pet Shops in the City.  Because
Crowley, Johnson and Rosenthal, like ARO's, improperly consider all profit-making commercial
dog breeders and Class B USDA licensees to be "puppy mills," any actual facts regarding sales
from substandard versus regulated, compliant licensees would have been meaningless.  No
matter the source, Defendants mistakenly and improperly believe that Pet Shops and their
sources are all "puppy mills."

293.    Wherefore, Plaintiff demands judgment in the form of declaratory relief finding
that Defendants Johnson and Crowley have violated 42 U.S.C. § 1985 by conspiring with each,
as described herein, to interfere with and deprive NYPWA-members' rights to equal protection
of the laws; damages, costs and attorneys' fees, and any other relief as this Court may deem just
and proper.

### COUNT VIII
### DECLARATORY RELIEF VIOLATION OF THE STATE CONSTITUTION
#### (Art. I, § 11 of the New York State Constitution)
#### (Against All Defendants)

294.    Plaintiff repeats and realleges the foregoing allegations as if more fully set forth at
length herein.

295.    Local Law 7 violates Section 11 of Article I of the New York State Constitution
by selectively discriminating against NYPWA-members and favoring Shelters and Rescues, who
are similarly situated.  The elements of Count IX and Count III are the same and are incorporated
herein by reference.

296.    Wherefore, Plaintiff demands judgment in the form of declaratory relief finding that the Laws violate Section 11 of Article I of the New York Constitution.

## PRAYER FOR RELIEF

WHEREFORE, NYPWA respectfully requests that the Court enter judgment in its favor as follows:

(a)    A declaratory judgment that Local Law 5 and Local Law 7, in relevant part, are pre-empted by Federal and State law;

(b)    A declaratory judgment that Defendants violated Plaintiff's rights under the Fourteenth Amendment of the Constitution of the United States and Article I, Section 11 of the New York State Constitution ;

(c)    A declaratory judgment that Defendants violated Plaintiff's rights under the Commerce Clause, U.S. Const., Art. I § 8, cl. 3 *et seq*.

(d)    Issue a permanent injunction, enjoining and prohibiting Defendants from enforcing the relevant parts of Local Law 5 and Local Law 7; and

(e)    That Plaintiff recovers the cost of this suit, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988, where applicable;

(f)    That, if Local Law 5 and Local Law 7 are enforced, Plaintiff has not waived its right to recover as a "taking" its property pursuant to the Constitution of the United States Art. I, and Section 7 of the Constitution of New York;

(g)    An award of damages in an amount to be determined at trial; and

(h)    Any other or further relief that the Court deems just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff, NYPWA hereby demands a trial by jury.

Dated:   June 17, 2015                          Respectfully submitted,

FOX ROTHSCHILD LLP


By:  s/ Nancy E. Halpern
*Nancy E. Halpern*
FOX ROTHSCHILD LLP
100 Park Avenue, Suite 1500
New York, NY 10017
Telephone: (212) 878-7900
*Attorneys for Plaintiff,*
*New York Pet Welfare Association*