UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

FOR PUBLICATION

---

NEW YORK PET WELFARE
ASSOCIATION, INC.,

                      Plaintiff,

        - versus -

THE CITY OF NEW YORK, THE NEW
YORK CITY COUNCIL, COREY
JOHNSON, individually and in his capacity
as New York City Councilman, ELIZABETH
S. CROWLEY, individually and in her
capacity as New York City Councilwoman,

                   Defendants.

MEMORANDUM
AND ORDER

15-cv-3159 (JG)

A P P E A R A N C E S:

        FOX ROTHSCHILD LLP
                100 Park Avenue, Suite 1500
                New York, NY 10017
        By:    Jeffrey M. Pollock
                James M. Lemonedes
                Nancy E. Halpern
                *Attorneys for Plaintiff*

        CORPORATION COUNSEL OF THE CITY OF NEW YORK
                100 Church Street
                New York, NY 10007
        By:    Zachary W. Carter
                Sheryl Neufeld
                Mark W. Muschenheim
                Anna I. Kurtz
                Aaron S. Rogoff
                *Attorneys for Defendants*

JOHN GLEESON, United States District Judge:

Plaintiff New York Pet Welfare Association, Inc. ("NYPWA") brings this action against defendants City of New York ("City"), New York City Council ("City Council"), Corey Johnson, individually and in his capacity as a New York City Councilman, and Elizabeth S. Crowley, individually and in her capacity as a New York City Councilwoman. NYPWA alleges that defendants have adopted laws that violate the Supremacy Clause, the Commerce Clause, the Equal Protection Clause, and the Due Process Clause of the U.S. Constitution, as well as New York law that governs veterinary medicine, the treatment of animals, and equal protection.

The challenged laws are the result of the City Council's desire to address several related problems arising out of the sale of dogs and cats in the City: pet store sales of animals bred and kept in inhumane conditions; deceptive trade practices in connection with such sales; and an overpopulation of unwanted dogs and cats. In essence, the laws require pet stores to obtain dogs and cats from Class A licensees of the United States Department of Agriculture ("USDA") who are in good standing, and they further require pet stores to spay or neuter the animals before selling them.

Defendants move to dismiss the case pursuant to Federal Rule of Civil Procedure 12(b)(6), arguing that plaintiff fails to allege a legally cognizable cause of action. For the reasons stated below, I agree, and the motion is granted.

## BACKGROUND

NYPWA's second amended complaint alleges the following facts, which I assume to be true for purposes of this motion. *See, e.g.*, *Freidus v. Barclays Bank PLC*, 734

F.3d 132, 135 (2d Cir. 2013) ("On a motion to dismiss for failure to state a claim on which relief can be granted, we assume the truth of the facts alleged.").[1]

A.      *The Parties*

      1.  *The New York Pet Welfare Association*

      Plaintiff NYPWA is a non-profit trade association of pet stores, dog and cat breeders and dealers, veterinarians, and pet owners, several of which maintain Class A and Class B licenses granted by the USDA.  Second Amended Complaint ("SAC") ¶¶ 1, 16.  NYPWA is incorporated in the state of New Jersey, and its members conduct business in various jurisdictions.  SAC ¶ 16.  NYPWA's stated mission is to ensure that pet owners have access to healthy, humanely treated, purebred puppies and kittens, as well as to educate the public, industry professionals, and policymakers about the pet industry.  *Id.*

      2.  *The Defendants*

      The City is a municipal entity created and authorized under the laws of the State of New York.  SAC ¶ 23.  The City Council is the legislative body for the City.  *Id.* at 24.  Defendant Corey Johnson is a City Councilman, the Chairman of the City Council's Committee for Health, and a co-sponsor of Local Laws 5 and 7, the laws in dispute.  *Id.* at 25.  Defendant Elizabeth S. Crowley is a City Councilwoman and is the primary sponsor of Local Laws 5 and 7.  *Id.* at 26.

---

[1]      Additionally, in considering a motion to dismiss, a court may take judicial notice of documents attached to, integral to, or referred to in the complaint, as well as documents filed in other courts and other public records.  *See, e.g., Global Network Commc'ns, Inc. v. City of New York,* 458 F.3d 150, 157 (2d Cir. 2006); *Subaru Distribs. Corp. v. Subaru of Am., Inc.,* 425 F.3d 119, 122 (2d Cir. 2005).  Here, various local and state laws are in dispute, and I take judicial notice of certain public records associated with the passage of such laws that plaintiff has attached to, or referred to, in the second amended complaint.

B.    *The Animal Welfare Act*

The Animal Welfare Act ("AWA" or the "Act"), *see* 7 U.S.C. §§ 2131-2159, regulates the sale of dogs and cats in interstate commerce.  It requires that any breeder who controls five or more breeding females to hold a "Class A" license[2] and that any entity that obtains or arranges for animals from a breeder to be sold to a pet store to hold a "Class B" license.[3]  Class A and Class B licensees are subject to USDA inspection for compliance with the AWA and the regulations promulgated thereunder.  *See* 9 C.F.R. §§ 2.1-2.3.  Under current regulations, however, "[a]ny person who maintains a total of four or fewer breeding female [animals]" is exempt from the AWA licensing scheme.  *See* 9 C.F.R. § 2.1(a)(3)(iii).

The AWA was intended, in part, "to assure the humane treatment of animals during transportation in commerce" and "to insure that animals intended for use in research facilities or for exhibition purposes or for use as pets are provided humane care and treatment." 7 U.S.C. § 2131(1)-(2).  Among other provisions, the Act regulates "dealers" of animals.  A "dealer" is defined, *inter alia*, as a "person who, in commerce, for compensation or profit, delivers for transportation, or transports, except as a carrier, buys, or sells, or negotiates the purchase or sale of . . . any dog or other animal whether alive or dead for research, teaching, exhibition, or use as a pet." *Id.* at § 2132(f).  Under the AWA, a dealer must possess a valid license to (1) "sell or offer to sell or transport or offer for transportation, in commerce, to any

---

[2]    Federal regulations define a Class A licensee breeder "as a person subject to the licensing requirements under part 2 and meeting the definition of a 'dealer' (§ 1.1), and whose business involving animals consists only of animals that are bred and raised on the premises in a closed or stable colony and those animals acquired for the sole purpose of maintaining or enhancing the breeding colony."  9 C.F.R. § 1.1.

[3]    Federal regulations define a Class B licensee as "a person subject to the licensing requirements under part 2 and meeting the definition of a 'dealer' (§ 1.1), and whose business includes the purchase and/or resale of any animal. This term includes brokers, and operators of an auction sale, as such individuals negotiate or arrange for the purchase, sale, or transport of animals in commerce. Such individuals do not usually take actual physical possession or control of the animals, and do not usually hold animals in any facilities. A class 'B' licensee may also exhibit animals as a minor part of the business."  9 C.F.R. § 1.1.

research facility or for exhibition or for use as a pet any animal," or (2) "buy, sell, offer to buy or sell, transport or offer for transportation, in commerce, to or from another dealer or exhibitor under this chapter any animals." *Id.* at § 2134. Similarly, federal regulations provide, in relevant part, that any person operating as a dealer "must have a valid license," unless the person qualifies for one of eight exceptions. 9 C.F.R. § 2.1(a)(1), (3). The regulations further provide that "[a]ny person whose license has been suspended or revoked shall not buy, sell, transport, exhibit, or deliver for transportation, any animal during the period of suspension or revocation." *Id.* at § 2.10(c).

C.    *The Challenged Pet Shop Laws*

In January 2015, the City enacted Local Laws 5 and 7 of 2015,[4] which were subsequently amended in June 2015 by Local Law 53 of 2015 (collectively, the "Pet Shop Laws").[5] The Pet Shop Laws establish a comprehensive regulatory framework for the sale of dogs and cats in City pet stores. *See* SAC ¶¶ 30-37. Prior to the passage of the laws, the City Council Committee on Health held three public hearings and heard extensive testimony related to the pet industry.[6] As mentioned above, the Pet Shop Laws were enacted to curb pet store sales of dogs and cats bred in substandard or inhumane conditions, to protect pet store customers and the public from deceptive trade practices, and to address the overpopulation of unwanted animals. *See* SAC Exs. 12, 14, 52.

---

[4]      Local Laws 5 and 7 are codified in the New York City Administrative Code ("NYC Ad. Code").

[5]      Although the laws in dispute were scheduled to take effect on June 1, 2015, the defendants agreed not to enforce the challenged legislation until October 31, 2015.

[6]      The public hearings were held on April 30, 2014, November 24, 2014, and April 21, 2015. SAC Exs. 12 (11/24/14 Tr.), 14 (4/21/15 Tr.), and 52 (4/30/14 Tr.).

Local Law 5, as amended, requires that all pet stores hold an operating permit issued by the New York City Department of Health and Mental Hygiene.[7] NYC Ad. Code § 17-372. Responding to concerns that many pet stores in the City relied on Class B licensees or distributors of animals and thus had no knowledge of the practices of the breeders who supplied the animals, Local Law 5 also requires that a pet store obtain any dog or cat that it offers for sale directly from a USDA Class A licensee that has met certain inspection standards. NYC Ad. Code § 17-1702(a); *see also* SAC ¶ 30, Exs. 2, 3.[8] However, an exemption from Local Law 5's definition of "pet shop" applies to "breeders who sell . . . directly to consumers fewer than twenty-five dogs or cats per year that are born or raised on the breeder's residential premises." NYC Ad. Code § 17-371(e). Nonetheless, those exempt breeders may not sell dogs or cats to pet stores unless they hold a USDA Class A license and are in compliance with NYC Ad. Code § 17-1702(a). Local Law 5 also requires pet stores to make available to consumers detailed information about the source and health of dogs and cats offered for sale, and to maintain records in connection with the purchase and sale of any dogs or cats. NYC Ad. Code. §§ 17-1703, 17-1704.

Local Law 7, as amended, requires pet stores to sterilize any dog or cat before releasing it to a purchaser, so long as the animal is at least eight weeks old and weighs at least two pounds. *See* NYC Ad. Code §§ 17-802, 17-804, 17-806, and 17-814. Local Law 7 also requires that pet stores obtain a completed license application from dog purchasers and any license fees required by law. Nonetheless, a "pet shop that allows an animal shelter or animal

---

[7]     A pet store is defined as "a facility other than an animal shelter where live animals are sold, exchanged, bartered, or offered for sale as pet animals to the general public at retail for profit." NYC Ad. Code § 17-371(f).

[8]     Specifically, the licensee must hold a valid and active license which has not been suspended within the past five years, and must not have received certain citations, cease and desist orders, or civil penalties within the past five years.

rescue group to use such pet shop's premises for the purpose of making animals available for adoption shall be exempt from the [sterilization requirement] . . . provided such pet shop does not have an ownership interest in any of the animals that are made available for adoption."  § 17-804(f); *see also* SAC ¶¶ 111, 266.

D.    *Procedural History*

NYPWA commenced this action on June 1, 2015.  ECF Dkt. No. 1.  On that same date I held a hearing on NYPWA's application to enjoin the City from enforcing the Pet Shop Laws pending the outcome of the case.  The defendants mooted that application by voluntarily agreeing not to enforce the challenged legislation until October 31, 2015.  On June 9, 2015, NYPWA filed an amended complaint.  ECF Dkt. No. 4.  On July 2, 2015, NYPWA sought leave to file a second amended complaint, ECF Dkt. No. 9, and I granted the request on July 6, 2015. ECF Dkt. No. 10.

NYPWA's second amended complaint alleges that the Pet Shop Laws "ban out-of-state dog and cat breeders and dealers from access to the City pet market, in violation of the Supremacy Clause, Due Process Clause and Commerce Clause of the United States Constitution and the New York State [] Constitution."  SAC ¶ 2.  NYPWA also alleges that the Pet Shop Laws impermissibly favor the pet rescue industry, in violation of the Commerce Clause and Equal Protection Clause of the U.S. Constitution.  *Id.*  NYPWA asserts further that Local Law 7 is "preempted by and conflicts with the State's laws governing licensed veterinarians."  SAC ¶ 10.  Finally, NYPWA alleges that "Crowley and Johnson conspired with each other . . . to interfere with and deprive NYPWA-members' rights to equal protection of the laws," in violation of 42 U.S.C. § 1985.

Oral argument on the defendants' motion to dismiss occurred on October 9, 2015. On October 30, 2015, I granted the motion in a docket entry that stated this opinion would follow. That order mooted plaintiff's application for a preliminary injunction prohibiting enforcement of the challenged laws.

## DISCUSSION

On a motion to dismiss pursuant to Rule 12(b)(6), a court must "accept all allegations in the complaint as true and draw all inferences in the non-moving party's favor." *LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475 (2d Cir. 2009) (internal quotation marks omitted). To survive such a motion, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 662 (citing *Twombly*, 550 U.S. at 555). A plaintiff's complaint "must at a minimum assert nonconclusory factual matter sufficient to nudge its claims across the line from conceivable to plausible to proceed." *EEOC v. Port Auth. of N.Y. & N.J.*, 768 F.3d 247, 254 (2d Cir. 2014) (quoting *Iqbal*, 556 U.S. at 680) (internal quotation marks omitted).

A.    *Federal Preemption*

NYPWA's first cause of action alleges that Local Law 5 is preempted by the AWA. SAC ¶ 209-19. NYPWA asserts that Congress established the AWA to exclusively regulate and license commercial dog and cat breeders, and that Local Law 5, which is codified at NYC Ad. Code § 17-1702, impermissibly excludes Class B USDA licensees and hobby breeders

from accessing the City's pet market. At bottom, NYPWA asserts that Class B licensees have an "absolute right" to sell puppies and kittens to pet shops in the City, SAC ¶ 4, and that Local Law 5 impermissibly "vitiates" the AWA licensing scheme. *Id.* at ¶ 217.

The Supremacy Clause of the U.S. Constitution provides that federal law "shall be the supreme Law of the Land." U.S. Const. art. VI, cl. 2. In determining whether preemption exists, courts must "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (internal quotation marks omitted). "This assumption provides assurance that the federal-state balance will not be disturbed unintentionally by Congress or unnecessarily by the courts." *Jones v. Rath Packing Co.*, 430 U.S. 519, 525 (1977) (internal citation and quotation marks omitted). "[O]ur task is to ascertain Congress' intent in enacting the federal statute at issue." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 95 (1983). In analyzing federal preemption claims, the "purpose of Congress is the ultimate touchstone." *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 208 (1985) (internal quotation marks omitted).

The Supreme Court has identified three circumstances that demonstrate congressional intent to preempt state law: (1) where Congress expressly states its intent to do so; (2) where Congress's scheme of federal regulation is sufficiently comprehensive to give rise to a reasonable inference that it leaves no room for the state to act; and (3) where state law actually conflicts with federal law. *See California Fed. Sav. & Loan Ass'n v. Guerra*, 479 U.S. 272, 280-81 (1987); *Wachovia Bank, N.A. v. Burke*, 414 F.3d 305, 313 (2d Cir. 2005). The AWA does not expressly contemplate congressional intent to preempt state law, and the regulatory scheme is not

so comprehensive that I can reasonably infer that it leaves no room for states to act.[9]  My inquiry

therefore focuses on the third preemption scenario -- whether Local Law 5 actually conflicts with

the AWA.

An actual conflict between state and federal law exists when "compliance with

both federal and state regulations is a physical impossibility," *Guerra*, 479 U.S. at 281 (quoting

*Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-43 (1963)), or where state law is

"an obstacle to the accomplishment and execution of the full purposes and objectives of

Congress," *Guerra*, 479 U.S. at 281 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).

There is a "presumption that state or local regulation of matters related to health and safety is not

invalidated under the Supremacy Clause."  *Hillsborough Cnty., Fla. v. Automated Med. Labs.,

Inc.*, 471 U.S. 707, 718 (1985).

First, I reject NYPWA's contention that the AWA grants Class B licensees an

absolute right to sell puppies and kittens in the City.  *See Zimmerman v. Wolff*, 622 F. Supp. 2d

240, 248 (E.D. Pa. 2008) ("AWA does not create an absolute right to be able to buy, sell and

transport dogs in every state by virtue of having a federal license to operate in interstate

commerce.").  AWA sets the floor, not the ceiling, for USDA license holders.  In fact, as noted

above, AWA explicitly contemplates additional local legislation relating to animal welfare.  *See*

7 U.S.C. § 2143(a)(8) ("[AWA] shall not prohibit any State (or a political subdivision of such

state) from promulgating standards in addition to those standards promulgated by the Secretary

_____

[9]         Indeed, the AWA expressly contemplates that it is to be read in *conjunction* with state and local
legislation. *See* 7 U.S.C. § 2145(b) ("The Secretary is authorized to cooperate with the officials of the various States
or political subdivisions thereof in carrying out the purposes of this Act *and of any State, local, or municipal
legislation or ordinance on the same subject*." (emphasis added)); *see also DeHart v. Town of Austin, Ind.,* 39 F.3d
718, 722 (7th Cir. 1994) ("[T]he Animal Welfare Act does not evince an intent to preempt state or local regulation
of animal or public welfare."); *Mo. Pet Breeders Ass'n v. Cty. of Cook*, 2015 WL 2448332, at *5 (N.D. Ill. May 21,
2015) ("Preemption cannot be inferred, as there is no indication that Congress intended exclusive federal regulation
in the area.").  Although NYPWA asserts that Local Law 5 revokes Class B licenses, nothing in the text of the law
purports to interfere or alter the status of USDA license holders.  *See* NYC Ad. Code § 17-372.

under paragraph (1).”); 7 U.S.C. § 2145(b) (“The Secretary is authorized to cooperate with the officials of the various States or political subdivisions thereof in carrying out the purposes of this chapter and of any State, local, or municipal legislation or ordinance on the same subject.”).

Second, the relevant inquiry is whether compliance with both Local Law 5 and the AWA is a “physical impossibility.” *Guerra*, 479 U.S. at 281. NYPWA argues that Local Law 5 “fatally conflicts” with the AWA because Class B licensees will be unable to rely on their licenses or exemptions therefrom to sell dogs and cats to City pet stores. This objection, however, does not give rise to a federal preemption claim. The AWA does not give an absolute right to Class B licensees to sell animals to pet stores in the City. Nor does Local Law 5 make it physically impossible for Class B licensees to comply with the AWA. By simply not selling their animals in the City, Class B licensees satisfy both local and federal law. Moreover, Class B licensees can reduce the number of female animals on their premises and obtain a Class A license to sell their animals to pet stores in the City. Therefore, I conclude that Local Law 5 does not actually conflict with the AWA.

Ultimately, “because the States are independent sovereigns in our federal system [and] we have long presumed that Congress does not cavalierly pre-empt state-law causes of action,” *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996), courts “have a duty to accept the reading that disfavors pre-emption.” *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449 (2005). Moreover, courts have consistently rejected claims that the AWA preempts local legislation concerning animals, even where the legislation bans activity that is otherwise authorized by the AWA. *See, e.g.*, *DeHart*, 39 F.3d at 722-23 (upholding ordinance that banned ownership of dangerous and wild animals); *Kerr v. Kimmel*, 740 F. Supp. 1525, 1529-30 (D. Kan. 1990) (concluding that the AWA did not preempt state licensing scheme for sale and breeding of dogs);

*Am. Canine Found. v. Sun*, 2007 WL 4208358, at *5 (N.D. Cal. Nov. 27, 2007) (finding that the AWA did not preempt local ordinance that required a mandatory spaying and neutering program); *Mo. Pet Breeders*, 2015 WL 2448332, at *5 (upholding ordinance allowing pet stores to sell only animals obtained from Class A licensees who possess no more than five female breeding animals, noting that "[a]n ordinance is not preempted merely because it will hurt local businesses economically").

Accordingly, I dismiss NYPWA's claim alleging that Local Law 5 is preempted by federal law.

B.        *State Preemption*

NYPWA's second cause of action alleges that the mandatory sterilization provision in Local Law 7 and the sourcing restrictions in Local Law 5 are preempted by New York State law.  SAC ¶¶ 221-69.  Specifically, NYPWA contends that New York General Business Law 753-d "prohibits jurisdictions from adopting local ordinances which 'essentially result in the banning of all sales of dogs or cats raised and maintained in a healthy and safe manner . . . .'"  SAC ¶ 221 (quoting N.Y. Gen. Bus. § 753-d).

In relevant part, N.Y. Gen. Bus. § 753-d provides:

> Nothing in this article shall be construed to . . . limit or restrict any municipality from enacting or enforcing a local law, rule, regulation or ordinance governing pet dealers, as such term is defined in this article, including a law, rule, regulation or ordinance governing the health or safety of animals acquired or maintained by pet dealers, the source of animals sold or offered for sale by pet dealers, and the spay or neuter of such animals; provided, however, that any such local law, rule, regulation or ordinance shall be no less stringent than the applicable provisions of this article and may not result in essentially banning all sales of dogs or cats raised and maintained in a healthy and safe manner.

The last clause of the statute prohibits local jurisdictions from enacting laws that result in the banning of all sales of dogs or cats raised and maintained in a humane manner. Local Law 5 does not ban the sale of *all* dogs and cats—pet stores are explicitly authorized to obtain animals from certain USDA Class A licensees.[10]  Therefore, Local Law 5 does not conflict with N.Y. Gen. Bus. § 753-d and is not preempted.

NYPWA also alleges that the Pet Shop Laws are "implicitly" preempted by New York State regulations governing the practice of veterinary medicine, pet shop licensing, and animal cruelty laws.[11]  SAC ¶¶ 228-38; *see also* Pl.'s Opp'n Br. at 13-17.  NYPWA asserts that the Pet Shop Laws "improperly control[] the fundamental practice of veterinary medicine" by requiring veterinarians to perform sterilization surgery on animals sold in pet stores.  Pl.'s Opp'n Br. at 14; *see* SAC ¶¶ 232-33, 240.  It further contends that Local Law 7 interferes with the obligations of veterinarians and pet stores to comply with state laws related to health certifications in pet store transactions.  SAC ¶ 228; *see also* N.Y. Gen. Bus. §§ 753, 753-a, 753-b.

As a threshold matter, defendants do not dispute that New York laws "require a veterinarian to make an independent assessment of the needs of each patient and provide for their care consistent with professional standards of care."  Def.'s Reply Br. at 14.  Local Law 7, however, does not require a veterinarian to perform sterilization surgery.  It simply mandates that no "pet shop shall release to a consumer a dog or cat that has not been sterilized."  NYC Ad.

---

[10]    Local Law 5 requires that the Class A licensee's license be valid and active, and that it not have been suspended within the past 5 years.  NYC Ad. Code § 17-1702(1).  It also requires that the licensee not have received certain finally determined citations from the USDA, *see* NYC Ad. Code § 17-1702(2)(a)-(d), and that in the most recent five years it not have received, in connection with a USDA enforcement action, an ALJ-issued, finally determined order to cease and desist or to pay a civil penalty, NYC Ad. Code § 17-1702(e)-(f).

[11]    Specifically, NYPWA alleges that Local Law 7 conflicts with Gen. Bus. Law §§ 753 (providing warranty to purchaser), 753-a (requiring a veterinarian examination), and 753-b (requiring pet dealers to provide "information statement" for purchaser).  *See* SAC ¶ 228-32.

Code l7-804(b).  A veterinarian may opt out of performing a surgery if she so chooses, or she may avoid working with pet shops altogether.

NYPWA alleges that the "sterilization mandate in Local Law 7 makes it impossible for Pet Shops (and veterinarians) who sterilize dogs and cats before sale to comply with [certain] State laws."  SAC ¶ 228.  That contention rests on the theory that the Pet Shop Laws "could render the Pet Shops liable for . . . future negative health effects" and "will increase the cost of business for the Pet Shops."  SAC ¶¶ 229-30.[12]  NYPWA further alleges that the Pet Shop Laws conflict with state laws that prohibit animal cruelty because "permitting such procedures could be accused of unjustifiably injuring or killing dogs and cats."  SAC ¶ 232.  These hypothetical consequences of the challenged provisions, even if accepted as true, fail to allege how the Pet Shop Laws actually conflict with state law.  In sum, the Pet Shop laws are not preempted by New York State law, and I therefore dismiss this cause of action.

C.  *Equal Protection*

NYPWA claims that the Pet Shop Laws deprive its members of equal protection of the laws under the New York and U.S. Constitutions.  It first asserts that Local Law 5 does so by prohibiting pet stores from purchasing animals from Class B licensees or unlicensed breeders, while not prohibiting such purchases from shelters and rescues.  SAC ¶ 262.  NYPWA next claims that Local Law 7 violates equal protection principles by requiring pet stores to sterilize dogs and cats before they are sold, while permitting exemptions from that requirement for shelters and not requiring rescues to sterilize animals at all.  SAC ¶ 263.  In sum, NYPWA

---

[12]    NYPWA also alleges that its members cannot comply with N.Y. Gen. Bus. Law § 753-b(1)(e)(ii), as incorporated into Local Law 5, which requires that pet stores provide each customer with an information statement that verifies any known disease or illness and that it is not likely to require future hospitalization.  NYPWA argues that "veterinarians cannot make such predictions after performing mandatory sterilization with known health risks."  *See* SAC ¶ 231.  The Pet Shop laws do not require, however, that pet stores conceal any known conditions or illnesses, nor does NYPWA allege that sterilization is a condition or illness that requires disclosure under this section of the law.

alleges that through the Pet Shop Laws, the City "favor[s] one source of puppies (Shelters and Retail Rescues) over others (Pet Shops)," SAC ¶ 9, in violation of state and federal equal protection laws. I consider these claims together, as state and federal equal protection claims are analyzed under the same framework. *See Under 21 v. City of New York*, 65 N.Y.2d 344, 360 n.6 (1985) (holding that New York's Equal Protection Clause "is no broader in coverage than the Federal Provision").

The Equal Protection Clause of the Fourteenth Amendment is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985); *Latrieste Rest. v. Village of Port Chester*, 188 F.3d 65, 69 (2d Cir. 1999). Here, NYPWA bases its equal protection claim primarily on a theory of "selective enforcement." SAC ¶ 261-70. "[T]o establish a violation of equal protection based on selective enforcement, the plaintiff must ordinarily show (1) the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as . . . intent to inhibit or punish the exercise of constitutional rights." *Lisa's Party City, Inc. v. Town of Henrietta*, 185 F.3d 12, 15-17 (2d Cir. 1999) (quotations and citations omitted).

"A showing that the plaintiff was treated differently compared to others similarly situated" is a prerequisite to a selective treatment claim. *Church of the Am. Knights of the Ku Klux Klan v. Kerik*, 356 F.3d 197, 210 (2d Cir. 2004). There is, however, disagreement within the Second Circuit regarding the precise standard for determining whether comparators are similarly situated for such a claim. Some courts have held that the plaintiff must "establish that (i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate

government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendants acted on the basis of a mistake." *Roman Catholic Diocese of Rockville Centre, N.Y. v. Inc. Vill. of Old Westbury*, 2012 WL 1392365, at *12 (E.D.N.Y. Apr. 23, 2012) (internal quotation marks and citations omitted) (collecting cases). Other courts have applied a less stringent standard, requiring "plaintiffs to show that plaintiff and comparators were 'similarly situated in all material respects,' or that 'a prudent person, looking objectively at the incidents, would think them roughly equivalent.'" *Missere v. Gross*, 826 F. Supp. 2d 542, 561 (S.D.N.Y. 2011) (quoting *Vassallo v. Lando*, 591 F. Supp. 2d 172, 184 (E.D.N.Y. 2008); *accord Yajure v. DiMarzo*, 130 F. Supp. 2d 568, 572 (S.D.N.Y. 2001). I need not decide which of these standards applies because NYPWA's allegations fail to satisfy either.

Under the more lenient pleading requirement, NYPWA must adequately allege that its proffered comparators are similarly situated in all material respects and that a prudent person would think them roughly equivalent.[13] While a plaintiff is not required to proffer evidence of similarly situated individuals at the motion to dismiss stage, the court "still must determine whether, based on a plaintiff's allegations in the complaint, it is plausible that a jury could ultimately determine that the comparators are similarly situated." *Mosdos Chofetz Chaim, Inc. v. Vill. of Wesley Hills*, 815 F. Supp. 2d 679, 698 (S.D.N.Y. 2011). NYPWA alleges that

---

[13] Generally, whether two comparators "are similarly situated is a factual issue that should be submitted to the jury." *Harlen Assoc. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 n. 2 (2d Cir. 2001). The Second Circuit, however, has held that this rule is not absolute and explained that "a court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met." *Id.* Thus, at the summary judgment stage of selective enforcement claims, courts ask whether based on the evidence, a reasonable jury could conclude that the plaintiff and the proposed comparators are similarly situated. At the motion to dismiss stage, the determination is whether, based on a plaintiff's allegations in the complaint, it is plausible that a jury could ultimately determine that the comparators are similarly situated. Thus, "[w]ell-pled facts showing that the plaintiff has been treated differently from others similarly situated remains an essential component of such a claim [and] [c]onclusory allegations of selective treatment are insufficient to state an equal protection claim." *Bishop v. Best Buy, Co.*, 2010 WL 4159566, at *11 (S.D.N.Y. Oct. 31, 2010) (citation and internal quotation marks omitted) (dismissing plaintiff's equal protection claim because he failed to allege any similarly situated individuals who were treated differently).

pet stores are similarly situated to shelters and rescues because both groups "transfer ownership of dogs and cats to consumers." SAC ¶ 261; *see also* SAC ¶¶ 122-26 (describing rescues as the "new era pet shops").[14] Defendants argue that pet stores and shelters are dissimilar because shelters are nonprofit entities, while pet stores make a profit.

I agree that NYPWA's alleged facts do not make its claim that pet stores are "similarly situated" to shelters or rescues plausible. While all three types of entities "transfer the ownership of cats and dogs to consumers for payment," SAC ¶ 116, such a high level of generality fails to serve as a meaningful comparator for an equal protection challenge. "[T]hat is like saying a homeless shelter is similarly situated to a luxury hotel because both provide rooms to sleep in." *Perfect Puppy, Inc. v. City of E. Providence*, 2015 WL 1474560, at *5 (D.R.I. Mar. 31, 2015). At the most fundamental level, pet stores are markedly dissimilar from rescues and shelters. Because equal protection claims require "more than [a] superficial similarity," *id.*, NYPWA's equal protection claims fail.

Even assuming, however, that NYPWA had pleaded facts sufficient to warrant a reasonable inference that pet stores are similarly situated to shelters and rescues *and* that pet stores are subject to selective adverse treatment, its equal protection claims would still fail. Such claims also require a showing that "the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure."[15]

---

[14] NYPWA claims that shelters and rescues have discussed plans to begin breeding dogs and importing puppies from overseas, attempting to further analogize pet stores with rescues and shelters. SAC ¶ 122. This claim is speculative and is therefore immaterial to the equal protection analysis.

[15] Selective discrimination claims are typically brought *after* a law is enforced. As previously noted, defendants agreed not to enforce the Pet Shop Laws pending my ruling on their motion to dismiss. For its selective discrimination claim, plaintiff relies on the plain language of the Pet Shop Laws, which unambiguously treats pet stores differently from shelters and rescues. Thus, though a selective enforcement claim is not ripe for review, I also construe plaintiff's argument as challenging the validity of the statute's classifications.

*Zahra v. Town of Southold*, 48 F.3d 674, 683 (2d Cir. 1995); *see also Terminate Control Corp. v. Horowitz*, 28 F.3d 1335, 1352 (2d Cir. 1994); *FSK Drug Corp. v. Perales*, 960 F.2d 6, 10 (2d Cir. 1992). NYPWA does not allege that its members are discriminated against because of their race, religion, or to prevent them from exercising a constitutional right.[16] Rather, it contends that the Pet Shop Laws were enacted maliciously or with bad faith intent to injure, and that the challenged classifications therefore amount to "invidious discrimination." Pl.'s Opp'n Br. at 30-32.

When a party challenges a government classification that does not involve a suspect class or burden fundamental rights, courts apply rational basis scrutiny. The classification will be constitutional so long as "there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Bryant v. N.Y. State Educ. Dep't*, 692 F.3d 202, 219 (2d Cir. 2012) (citing *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993)). Challenged classifications are entitled to "a strong presumption of validity." *Beach Commc'ns*, 508 U.S. at 314-15. The party attacking a classification's rationality bears the burden of negating "every conceivable basis which might support it." *Armour v. City of Indianapolis, Ind.*, 132 S. Ct. 2073, 2080 (2012) (internal citation and quotation marks omitted); *accord Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 136 (2d Cir. 2013).

Thus, NYPWA's equal protection claims must be rejected "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Heller v. Doe*, 509 U.S. 312, 320 (1993) (internal quotation marks omitted); *accord Benjamin v. Jacobson*, 172 F.3d 144, 165 (2d Cir. 1999) (en banc). Here, the City seeks to reduce pet homelessness and euthanasia. By permitting pet stores to sell animals obtained only from Class

---

[16] Plaintiff acknowledges that it is "not an inherently suspect or quasi-suspect class." Pl.'s Opp'n Br. at 30.

A licensees, the Pet Shop Laws could arguably reduce dog homelessness and euthanasia. Therefore, "the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational." *Nordlinger v. Hahn*, 505 U.S. 1, 11 (1992).

Because there is a rational basis for the City to classify pet stores differently from shelters and rescues, and the factual allegations in the second amended complaint do not make a contrary conclusion plausible, I dismiss NYPWA's equal protection claims. *See Chestnut Ridge Associates, LLC v. Vill. of Chestnut Ridge*, 194 F. App'x 76, 77 (2d Cir. 2006) (holding that the "complaint fails to allege sufficient facts to support the second prong of the equal protection pleading requirement—that there was no rational basis for the difference in treatment alleged" (internal quotation marks omitted)); *see also Rosa v. City Univ. of N.Y.*, 306 F. App'x 655, 657 (2d Cir. 2009) (affirming district court's 12(b)(6) dismissal of equal protection claim).

D.      *Commerce Clause*

NYPWA alleges that the Pet Shop Laws violate the dormant Commerce Clause, arguing that the laws impermissibly regulate extraterritorially and favor local interests.[17] SAC ¶¶ 272-82. NYPWA asserts further that other, non-discriminatory means to advance defendants' purported interests were available but ignored when the Pet Shop Laws were adopted.

The Commerce Clause provides that "Congress shall have Power . . . [t]o regulate Commerce with foreign Nations and among the several States . . . ." U.S. Const. Art. I, § 8, cl. 3.

---

[17]      Defendants assert that the Pet Shop Laws are not subject to a Commerce Clause claim, arguing that the AWA specifically authorizes local laws to address animal welfare issues, relying on *White v. Mass. Council of Constr. Employers. Inc.*, 460 U.S. 204, 213 (1983) ("Where state or local action is specifically authorized by Congress, it is not subject to the Commerce Clause even if it interferes with interstate commerce."). However, the fact that the AWA contemplates that state and local jurisdiction may enact certain supplementary laws does not authorize the City to enact laws that burden interstate commerce. *See Puppies 'N Love v. City of Phoenix*, 2015 WL 4532586, at *6 (D. Ariz. July 27, 2015) ("AWA's savings clause does not clearly and unambiguously authorize Phoenix to enact an ordinance that discriminates against interstate commerce.")

In addition, under the so-called "dormant" Commerce Clause doctrine, courts have "long interpreted the Commerce Clause as an implicit restraint on state authority, even in the absence of a conflicting federal statute." *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 337 (2007); *see Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 337-38 (2008) ("The modern law of what has come to be called the dormant Commerce Clause is driven by concern about 'economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors'" (quoting *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 273-74 (1988))).

A state or local regulation may violate the dormant Commerce Clause in three circumstances. First, a statute that clearly discriminates against interstate commerce in favor of intrastate commerce is "virtually invalid *per se*," *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 108 (2d Cir. 2001), and can survive only if the discrimination is "demonstrably justified by a valid factor unrelated to economic protectionism," *Wyoming v. Oklahoma*, 502 U.S. 437, 455 (1992). Second, if the statute does not explicitly discriminate against interstate commerce, it will nevertheless be invalidated under the *Pike* balancing test if it "imposes a burden on interstate commerce incommensurate with the local benefits secured." *Nat'l Elec. Mfrs.*, 272 F.3d at 108 (citing *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)).[18] Third, a statute will be *per se* invalid if it has the practical effect of "extraterritorial" control of commerce occurring entirely outside the boundaries of the state in question. *Healy v. The Beer Inst.*, 491 U.S. 324, 336 (1989). Thus, "the minimum showing required to succeed in a Commerce Clause challenge to a state regulation is that it have a disparate impact on interstate commerce." *Automated Salvage*

---

[18]     Nonetheless, courts will uphold a nondiscriminatory statute that affects interstate commerce only incidentally, "unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike*, 397 U.S. at 142.

*Transp., Inc. v. Wheelabrator Envtl. Sys., Inc.*, 155 F.3d 59, 75 (2d Cir. 1998); *accord SPGGC, LLC v. Blumenthal*, 505 F.3d 183, 192 (2d Cir. 2007) ("To prove that a state law is either *per se* invalid or fails the *Pike* balancing test, a plaintiff must at least show that the law has a 'disparate impact' on interstate commerce.").

         1.   *Clear Discrimination*

        "A clearly discriminatory law may operate in three ways: (1) by discriminating against interstate commerce on its face; (2) by harboring a discriminatory purpose; or (3) by discriminating in its effect." *Town of Southold v. Town of E. Hampton*, 477 F.3d 38, 48 (2d Cir. 2007) (internal citations omitted). Here, the Pet Shop Laws do not facially discriminate against interstate commerce. Additionally, NYPWA does not allege facts sufficient to support an inference that the Pet Store Laws harbor a purpose to discriminate specifically against out-of-state actors.[19] *See* SAC ¶¶ 148-592; Pl.'s Opp'n Br. at 23. Rather, the Pet Shop Laws impose certain requirements on *all* parties, irrespective of in-state or out-of-state interests.

        NYPWA further contends that the Pet Shop Laws discriminate against interstate commerce in "practical effect" by prohibiting pet stores from purchasing animals from out-of-state Class B licensees. *See* SAC ¶¶ 275-76. Notably absent from the complaint, however, is the fact that *in-state* Class B licensees are also prohibited from selling their animals to City pet stores. *See* NYC Ad. Code § 17-1702(a). Additionally, the Pet Shop Laws permit pet stores to acquire animals from out-of-state Class A licensees and out-of-state animal rescue organizations. *Id.*; *see also id.* at § 17-814(b). At best, NYPWA's allegations suggest that some out-of-state

---

[19] Plaintiff points to comments made by City Council members expressing an effort to join a nationwide effort to "keep bad actors" out of the pet industry supply chain. *See* SAC ¶¶ 150-59; *Id.* at Ex. 12. Even taking such comments at face value, they cannot reasonably be construed to support a claim that the Pet Shop Laws harbor a discriminatory purpose. Keeping "bad actors" out of the pet industry supply chain not only sounds unobjectionable, but it applies equally to *all* such actors, not just the out-of-state ones. I also reject plaintiff's suggestion that public hearing comments made by members of the public can reasonably impute a discriminatory purpose to the Pet Shop Laws.

breeders *might* lose City sales if they fail to modify their professional practices to comply with the Pet Shop Laws. But "the fact that the burden of a state regulation falls on some interstate companies does not, by itself, establish a claim of discrimination against interstate commerce." *Exxon Corp. v. Governor of Md.*, 437 U.S. 117, 126 (1978); *accord Perfect Puppy, Inc.*, 2015 WL 1474560, at *2 ("Indirectly reducing purchases that happen to be made exclusively from out-of-state suppliers is a far cry from 'invidiously discriminating' in practical effect." (quoting *Cherry Hill Vineyard, LLC v. Baldacci*, 505 F.3d 28, 36 (1st Cir. 2007)). Accordingly, I conclude that NYPWA has failed to adequately plead that the Pet Shop Laws harbor a discriminatory purpose, or that they discriminate in effect to burden out-of-state commerce.

    2. Pike *Balancing*

    Under the *Pike* balancing test, a nondiscriminatory regulation that "regulates even-handedly to effectuate a legitimate local public interest," *Pike*, 397 U.S. at 142, is nevertheless unconstitutional if "the burden imposed on interstate commerce is clearly excessive in relation to the putative local benefits." *United Haulers Ass'n, Inc. v. Oneida–Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 346 (2007) (internal quotation marks omitted). Nonetheless, "a burden that seems incommensurate to the statute's gains survives *Pike* as long as it affects intrastate and interstate interests similarly—the similar effect on interstate and intrastate interests assuaging the concern that the statute is designed to favor local interests." *Brown & Williamson Tobacco Corp. v. Pataki*, 320 F.3d 200, 209 (2d Cir. 2003). Here, the Pet Shop Laws prohibit pet stores from purchasing dogs or cats from Class B licensees regardless of whether those licensees are from New York or out-of-state. Thus, the laws affect intrastate and interstate interests similarly. Moreover, the City has a legitimate interest in promoting the humane treatment of dogs and cats within its borders. *See Hughes v. Oklahoma*, 441 U.S. 322, 337

(1979) (protecting wild animals is a legitimate local interest); *Cavel Int'l, Inc. v. Madigan*, 500 F.3d 551, 557 (7th Cir. 2007) ("States have a legitimate interest in prolonging the lives of animals that their population happens to like.").

The *Pike* balancing test does not invite courts to second-guess legislatures by estimating the probable costs and benefits of the statute, nor is it within the competency of courts to do so. An "excessive" burden in this setting is a burden on interstate commerce that is different from the burden imposed on intrastate commerce. *Sorrell*, 272 F.3d at 109; *see id.* ("[T]o run afoul of the *Pike* standard, the statute . . . must impose a burden on interstate commerce that is qualitatively or quantitatively different from that imposed on intrastate commerce"). Plaintiff's allegations do not support an inference that the Pet Shop Laws impose a burden on interstate commerce that is qualitatively or quantitatively different from that imposed on intrastate commerce, much less a burden that is incommensurate to the local benefits of the challenged laws.

### 3. Extraterritorial Control of Commerce

Finally, I reject NYPWA's allegation that the Pet Shop Laws have the practical effect of extraterritorial control of commerce occurring entirely outside the boundaries of New York. *See, e.g.*, *Healy*, 491 U.S. at 332 ("[A] regulation may disproportionately burden interstate commerce if it has the practical effect of requiring out-of-state commerce to be conducted at the regulating state's direction.); *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 582 (1986) (noting that local laws may not "project its legislation into other States"). NYPWA's extraterritoriality argument fails because the Pet Shop Laws do not inescapably require other jurisdictions to comply with their requirements, nor do they direct other states to act in any way. In fact, the laws make no mention of other states for any purpose and "none of the

indicia of an impermissible extraterritorial regulation are present." *Freedom Holdings, Inc. v. Spitzer*, 357 F.3d 205, 221 (2d Cir. 2004).

Ultimately, even accepting all of the plaintiff's factual allegations as true, they fail to support an inference that the Pet Shop Laws are acts of economic protectionism. Rather, they are an attempt to curb the problems associated with the inhumane treatment of animals and local pet homelessness and euthanasia. NYPWA's allegations that the Pet Shop Laws violate the Dormant Commerce Clause therefore fail as a matter of law.[20]

E.     *Federal Due Process*

NYPWA alleges that the Pet Shop Laws violate procedural and substantive due process. *See* SAC ¶¶ 244-58. Specifically, it contends that its members' substantive due process rights were violated "by [the defendants] infringing upon [their] rights under their licenses irrationally, arbitrarily, and in utterly bad faith." Pl.'s Opp. Br. at 32. NYPWA also claims that that the defendants violated "procedural due process rights by terminating licensure rights without notice or a hearing." Pl.'s Opp. Br. at 38.

1.     *Substantive Due Process*

To sustain a substantive due process claim, a plaintiff must demonstrate that he was deprived of a fundamental constitutional right, *see Local 342, Long Island Pub. Serv. Emp., UMD, ILA, AFL–CIO v. Town Bd. of Huntington*, 31 F.3d 1191, 1196 (2d Cir. 1994), by government action that is arbitrary or "conscience-shocking," *Kaluczky v. City of White Plains*, 57 F.3d 202, 211 (2d Cir. 1995). Substantive due process protections extend only to those interests that are "implicit in the concept of ordered liberty," *Palko v. Connecticut*, 302 U.S. 319,

---

[20]     Although I conclude that NYPWA has failed to adequately allege that the Pet Shop Laws have a disparate impact on interstate commerce, *see Blumenthal*, 505 F.3d at 192, even assuming that it had done so, the claims fail under any Dormant Commerce Clause analysis.

325 (1937), and rights "so rooted in the traditions and conscience of our people as to be ranked as fundamental," *Reno v. Flores*, 507 U.S. 292, 303 (1993) (internal quotation marks omitted). In sum, substantive due process "protects individuals against government action that is arbitrary, conscience-shocking, or oppressive in a constitutional sense, but not against government action that is incorrect or ill-advised." *Lowrance v. Achtyl*, 20 F.3d 529, 537 (2d Cir. 1994) (internal citations and quotation marks omitted).

The first step in substantive due process analysis is to determine whether the plaintiff has alleged the violation of a fundamental right. NYPWA's allegations fail to meet this threshold requirement. As stated earlier, the AWA does not grant USDA Class A and Class B license holders an absolute right to sell animals in the City. Moreover, the Pet Shop laws do not interfere with these federally-granted licenses; NYPWA members retain their licenses irrespective of the Pet Shop Laws. Therefore, the challenged laws do not interfere with any cognizable property interest. Accordingly, in the absence of factual allegations supporting the existence of a constitutionally-protected right, NYPWA's substantive due process claim necessarily fails.

Even if the complaint had sufficiently alleged the violation of a fundamental right, NYPWA must also allege facts supporting the inference that the state action was "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *County of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998); *see Matican v. City of N.Y.*, 524 F.3d 151, 155, 158-59 (2d Cir. 2008). The second amended complaint makes no such allegations, so NYPWA's substantive due process claim is deficient for that reason as well. *See Gounden v. Campagna*, 487 F. App'x 624, 626 (2d Cir. 2012) (affirming district court's 12(b)(6) dismissal

because plaintiff failed to plead facts supporting the inference that the defendants' alleged acts were arbitrary, conscience-shocking, or oppressive in the constitutional sense).

## 2. *Procedural Due Process*

The Fourteenth Amendment requires that "[n]o state shall . . . deprive any person of . . . property, without due process of law."  Procedural due process claims are analyzed under a two-step inquiry: first, a court must determine "whether there exists a . . . property interest of which a person has been deprived."  *Swarthout v. Cooke*, 562 U.S. 216, 218 (2011), and, if so, a court must "ask whether the procedures followed by the State were constitutionally sufficient." *Id.*; *accord Oneida Indian Nation of New York v. Madison Cty.*, 665 F.3d 408 (2d Cir. 2011).[21]

Typically, procedural due process requires that "a deprivation of life, liberty, or property be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (internal quotation marks omitted).  Certain due process protections are not required, however, when the government takes legislative action.  *See Interport Pilots Agency, Inc. v. Sammis*, 14 F.3d 133, 142 (2d Cir. 1994) ("Official action that is legislative in nature is not subject to the notice and hearing requirements of the due process clause."); *see also RR Vill. Ass'n, Inc. v. Denver Sewer Corp.*, 826 F.2d 1197, 1204 (2d Cir. 1987).  The Supreme Court has not recognized a constitutional right to participate directly in legislative action because of the "massive intrusion into state and federal policymaking" that would result.  *Minn. State Bd. for Cmty. Colls. v. Knight*, 465 U.S. 271, 284-85 (1984).  "Government makes so many policy decisions affecting so many people that it would

---

[21]     A court must balance three factors in determining what process is due: (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."  *McMenemy v. City of Rochester*, 241 F.3d 279, 288 (2d Cir. 2001) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

likely grind to a halt were policymaking constrained by constitutional requirements on whose voices must be heard." *Id.* at 285. "Instead, the public may influence the legislative process by effectuating its power over those elected officials through, *inter alia*, the electoral process." *Kittay v. Giuliani*, 112 F. Supp. 2d 342, 353 (S.D.N.Y. 2000), *aff'd*, 252 F.3d 645 (2d Cir. 2001).

NYPWA fails to plead facts sufficient to give rise to a claim that its members were deprived of a property interest. Even assuming that NYPWA's members have acquired protectable property interests in federally or state-granted licenses, such as state veterinary licenses or USDA licenses granted under the AWA, *see* Pl.'s Opp'n Br. at 33, the Pet Shop Laws do not revoke or interfere with any of those licenses. Therefore, NYPWA has not made the threshold allegation that its members were deprived of a property interest. Even if it had, as described above, where a legislative body has taken official action, the typical notice and hearing requirements of the Due Process Clause are not required. *See Sammis*, 14 F.3d at 142 ("'When not bounded by statutory procedural requirements, the Supreme Court has consistently been willing to assume that due process does not require any hearing or participation in 'legislative' decisionmaking other than that afforded by judicial review after rule promulgation.'" (quoting *Pickus v. U.S. Bd. of Parole*, 543 F.2d 240, 244 (D.C. Cir. 1976)); *see also United States v. Florida E. Coast Ry. Co.*, 410 U.S. 224, 245 (1973) ("Constitutional due process requirements apply only where official action is designed to adjudicate disputed facts in particular cases." (internal quotation marks omitted)).

F. *Section 1985*

Finally, NYPWA alleges that City Councilmembers Corey Johnson and Elizabeth Crowley violated 42 U.S.C. § 1985 by agreeing, "through concerted, overt action to deprive NYPWA's members of their rights for equal protection and equal privileges and immunities

under law, causing injury or depriving NYPWA's members of their rights." Pl.'s Opp'n Br. at 40-41; *see* SAC ¶¶ 6, 186-208, 204-05, 284-93, Exs. 10, 12, 14, 27, 28. [22]

To state a cause of action under § 1985(3), a plaintiff must allege: (1) a conspiracy; (2) for the purpose of depriving a person or class of persons of the equal protection of the laws, or the equal privileges and immunities under the laws; (3) an overt act in furtherance of the conspiracy; and (4) an injury to the plaintiff's person or property, or a deprivation of a right or privilege of a citizen of the United States. *United Bhd. of Carpenters & Joiners of Am., Local 610, AFL-CIO v. Scott*, 463 U.S. 825, 828-29 (1983); *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085, 1087 (2d Cir. 1993). The issue of "whether the plaintiff has asserted a violation of a constitutional right at all" is a "purely legal question." *Siegert v. Gilley*, 500 U.S. 226, 232 (1991). If the complaint does not allege a cognizable federal claim, the defendants are entitled to have their motion to dismiss granted as a matter of law. *See, e.g., id.*; *Mitchell v. Forsyth*, 472 U.S. 511, 525-30 (1985). The conspiracy must also be motivated by "some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action." *Id.* at 829; *accord Thomas v. Roach*, 165 F.3d 137, 146 (2d Cir. 1999).

This claim fails for several reasons. First, as indicated elsewhere in this memorandum and order, the complaint does not allege a viable constitutional claim, much less a conspiracy to violate constitutional rights.

Second, though the second amended complaint alleges "participation" in a "conspiracy," those are conclusory allegations that are insufficient to state a claim. *Roach*, 165 F.3d at 147; *see also Ostrer v. Aronwald*, 567 F.2d 551, 553 (2d Cir. 1977) (per curiam). There are no factual allegations that would support an inference that there was a "meeting of the

---

[22] Although the complaint describes New York State Assembly Member Linda Rosenthal as a co-conspirator, Rosenthal was removed as a defendant on June 12, 2015. *See* ECF Dkt. No. 6

minds" on the part of the alleged coconspirators, with the conscious purpose of injuring NYPWA members' constitutional rights.[23]

Third, legislators enjoy absolute immunity for legislative acts, regardless of their motivation. *See generally Bogan v. Scott-Harris*, 523 U.S. 44 (1998) ("Whether an act is legislative turns on the nature of the act, rather than on the motive or intent of the official performing it."); *Tenney v. Brandhove*, 341 U.S. 367, 371, 377 (1951) (legislator entitled to absolute immunity for allegedly singling out plaintiff for investigation in order "to intimidate and silence plaintiff and deter and prevent him from effectively exercising his constitutional rights" (internal quotation marks omitted); "[t]he claim of an unworthy purpose does not destroy the privilege"; it is "not consonant with our scheme of government for a court to inquire into the motives of legislators" acting in their legislative capacity).[24]

Finally, this cause of action is based on plaintiff's members' disagreements with these legislators' views on the merits of the animal welfare and control issues that gave rise to the challenged laws. The individual defendants wrongly consider all for-profit commercial dog breeders to be "puppy mills," the second amended complaint alleges, and their real but undisclosed intention is to bring about the "demise" of puppies in the City. *See* SAC ¶¶ 127, 287, 292. It is no slight to the City Council to say that if an incorrect material statement by a

---

[23] The alleged conspiratorial activities consist almost exclusively of testimony given before the City Council, SAC ¶¶ 193-95, 199-202, 204-207, the text of City Council legislative acts and related reports, *id.* at ¶¶ 196-97, 203, and the text of the Pet Shop Laws and New York State legislation, *id.* at ¶¶ 192, 198, 209. SAC ¶¶ 187- 88. At bottom, the councilmembers are alleged to have expressed their views. The only concrete acts ascribed to them are attending meetings, making statements, and writing letters. Allegations that Crowley and Johnson entered into an agreement with New York State Assembly Member Rosenthal and various non-profit organizations to stamp out "puppy mills" cannot sustain a claim of conspiracy to deprive others of equal protection or equal privileges and immunities.

[24] Additionally, NYPWA's assertion that qualified immunity cannot be granted at the motion to dismiss stage is erroneous. *See, e.g.*, *X-Men Sec., Inc. v. Pataki*, 196 F.3d 56, 66 (2d Cir. 1999) (holding that where complaint fails to sufficiently allege the violation of a federal right, "the defendant is entitled to have his qualified-immunity motion granted promptly as a matter of law.").

legislator, or a pernicious ulterior motive for a proposed law, could support a claim under section 1985, there would likely be no end to such lawsuits.  Plaintiff misapprehends the difference between an impermissible law -- one that offends federally protected constitutional rights -- and an ill-advised one, or one that is based on factual misconceptions or bad motives of the legislators who enacted it.  Even accepting as true all of plaintiff's factual allegations here, the laws they challenge fit only in the latter categories, and thus plaintiff may not obtain any relief in this Court.

CONCLUSION

For the reasons stated above, the motion to dismiss the claims is granted and the motion for preliminary injunction is denied.

So ordered.

John Gleeson, U.S.D.J.

Dated: November 12, 2015
        Brooklyn, New York